Professor Juan E. HERNANDEZ–CRUZ,
Plaintiff,

v.

FORDHAM UNIVERSITY, etc., et
al., Defendants.

79 Civ. 4122 (JEL).

United States District Court,
S. D. New York.

June 17, 1981.

Thomas I. Atkins, Charles E. Carter, James I. Meyerson, New York City, for plaintiff.

Rogers & Wells, New York City, for defendants by Joseph H. Spain, Margaret Blair Soyster, New York City.

LUMBARD,* Circuit Judge:

Following Fordham University's denial of his application for tenure in May 1978, Juan E. Hernandez-Cruz brought this action seeking equitable relief and damages against Fordham and four of its administrative officers alleging unlawful discrimination based upon his Puerto Rican heritage in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The plaintiff specifically alleges illegality in Fordham's acts of (1) denying him tenure because he had not completed his Ph.D. as required by university statutes, (2) requiring that he apply for tenure when he did, and (3) denying him a faculty fellowship which he asserts would have allowed him to complete his Ph.D. in time for tenure review. The court finds that Fordham applied its policies in a non-discriminatory fashion and denied Hernandez-Cruz tenure because he lacked the necessary academic degree. Accordingly, the court grants judgment for the defendants.

In order fairly to appraise the reader of the evidence presented in the seven-day bench trial, a somewhat detailed factual summary is required. Juan E. Hernandez-Cruz is a 43 year-old Hispanic individual of Puerto Rican origin. He received his Bachelor of Arts degree from the University of Puerto Rico in 1962 with a major in the social sciences. He then spent a year in

* Sitting by designation.

New York, improving his English and auditing courses at New York University. He received his Master of Education degree from the University of Puerto Rico in 1970 after spending several years employed in publishing, public relations, and translation. He then taught full-time at the University of Puerto Rico for two academic years.

Late in the summer of 1972, Hernandez-Cruz returned to the United States to undertake a Ph.D. program in Sociology at New York University as a full-time student. To finance the degree, he had received a three-year fellowship from the University of Puerto Rico, which was given in anticipation of his eventually returning to teach at the University of Puerto Rico. The fellowship provided eight thousand dollars a year in addition to tuition. On August 11, 1972, he applied for an adjunct (part-time) teaching position at Fordham's College at Lincoln Center. With the endorsement of J. A. Gonzales-Gonzales, the Chairperson of the Puerto Rican Studies Department and the Department's only full-time faculty member, Hernandez-Cruz received the adjunct position, teaching one course in the fall semester and two in the spring.

Fordham University is a New York educational corporation that offers graduate and undergraduate education in the liberal arts and selected professional fields. It comprises several distinct schools of instruction: the College at Lincoln Center in Manhattan (where the events in dispute took place), Fordham College at Rose Hill in the Bronx, the Graduate School of Arts and Sciences, the Graduate School of Religion and Religious Studies, and the Schools of Law, Business Administration, Education, and Social Service.

The individual defendants are, and were at all relevant times, administrative officers of Fordham. Reverend James C. Finlay is President of Fordham. Dr. Joseph F. X. McCarthy has been Vice President for Academic affairs since July of 1976. Reverend George McMahon is the Vice President for Administration. Dr. George W. Shea is the Dean of the College at Lincoln Center.

The College at Lincoln Center has consistently been organized into two types of subdivisions which have carried different names over time although their organizational functions have remained the same. First, there are "divisions" or "departments," which organize the faculty for purposes of tenure and hiring determinations. Second, there are "programs" or "institutes," which are organizations of specific curricula. The faculty who teach in a program or institute must be members of one of the divisions or departments, and the hiring and tenure decisions affecting them are made by that division or department. The courses taught and the requirements for a major within a program or institute, however, are established by the program or institute.

Since the early 1970s, the undergraduate curriculum at Fordham's College at Lincoln Center has comprised four major divisions: Arts, Humanities, Science and Mathematics, and Social Sciences. Before the transition to four divisions, the faculty had been organized into eight or nine departments which encompassed more narrowly defined disciplines. Fordham first established courses in Puerto Rican studies at the College at Lincoln Center in 1969 and 1970 in the form of a Puerto Rican Studies Program. In the 1971–1972 academic year, the Program became a department and therefore a faculty subdivision in addition to a curricular one, and it attained the corresponding control over hiring and tenuring the faculty for the Puerto Rican Studies courses. When the other departments were consolidated into the four major divisions, a dispute arose over the Puerto Rican Studies Department, as well as the Black Studies Department. First, although no witness in this case disputed that Puerto Rican Studies is a legitimate field of scholarly inquiry, it is an interdisciplinary subject and not a separate academic discipline such as philosophy, history, or economics. Accordingly, it appeared inconsistent to retain distinct faculty subdivisions for the ethnic studies departments while the other divisions incorporated broad fields of inquiry and multiple academic disciplines. Second, and more im-

portant, both Black and Puerto Rican Studies were too small to operate effectively as divisions. The University Statutes are drafted on the assumption that there will be at least five full-time faculty members in each department, while Puerto Rican Studies never had more than two; specifically, since Puerto Rican Studies had no tenured faculty members, committees to make tenure recommendations had to be appointed entirely from other departments. Thus, it seemed logical to transform the Black and Puerto Rican Studies Departments into institutes; the substantial support among students and faculty for retaining the independence of those departments, however, made that transformation a difficult one for the administration to achieve. Accordingly, until the 1975–1976 academic year, when Hernandez-Cruz had already been teaching full-time for a year at Fordham, Black and Puerto Rican Studies remained as departments—and indeed were called divisions on occasion—while the remainder of the old departments at the College at Lincoln Center had been consolidated into four divisions.

On his initial application for the adjunct position at Fordham, Hernandez-Cruz anticipated that he would complete his Ph.D. in 1974. In that estimation, however, he assumed that 38 credits from the University of Puerto Rico would be transferable toward his doctorate at N.Y.U. However, because his graduate studies in Puerto Rico had been in education instead of sociology, he learned in late 1973 that he would receive only 24 credits.

In the 1973–1974 academic year, Hernandez-Cruz continued his full-time studies at N.Y.U. and, with Chairperson Gonzales-Gonzales's endorsement, reapplied for an adjunct position at Fordham. He was reappointed and taught one course each semester that year at Fordham. In the spring semester of 1974, he was also appointed as a part-time instructor at N.Y.U. to teach one course there.

In the 1974–1975 academic year, Hernandez-Cruz shifted his emphasis from his role as student to his role as teacher: he became only a part-time student in his Ph.D. program at N.Y.U. and applied for a full-time position at Fordham. On April 25, 1974, Fordham's Associate Vice President, Father William C. Bier, appointed Hernandez-Cruz as a full-time Instructor in the Department of Puerto Rican Studies; and Hernandez-Cruz accordingly had to resign his fellowship from the University of Puerto Rico. As his first full-time appointment with Fordham, 1974–1975 was the first year of teaching that would apply toward his evaluation for tenure there.

University faculty view tenure as the prime guarantee of their academic freedom. Having received tenure, a faculty member can only be dismissed for cause and thus is effectively assured of continued employment until retirement. Fordham, like most American universities, has adopted the tenure standards proposed by the American Association of University Professors. The A.A.U.P. proposed, and Fordham adopted, a seven-year probationary period for evaluating candidates for tenure. Because Fordham issues faculty contracts at least a year before the contract will expire (again pursuant to A.A.U.P. principles), the seven-year probationary period leaves almost six years for the other faculty members to observe and evaluate the candidate's worth.

When Fordham adopted the A.A.U.P. tenure system in 1967, it abandoned its previous system of employment security based on professorial rank rather than length of service. To avoid any unfairness to the existing faculty, Fordham granted automatic tenure to all faculty who had been employed full-time for seven years as of 1967. Thus, faculty who were so granted tenure in 1967 were not required to hold doctoral degrees as has consistently been the University's policy since then.

For instructors who have had previous full-time experience at another university, both Fordham and the A.A.U.P. allow credit for one, two, or three years to be deducted from the seven-year probation, depending upon the number of years spent in full-time teaching elsewhere. When Hernandez-Cruz received his first full-time con-

tract at Fordham on April 25, 1974, he was given credit for his two years' teaching experience at the University of Puerto Rico. Accordingly, his probationary period was scheduled to end August 31, 1979, which meant he would be reviewed for tenure in the spring of 1978. Chairperson Gonzales-Gonzales stressed those two years' experience in his recommendation of Hernandez-Cruz for the Instructor position, and he urged Dean Shea to consider them in determining Hernandez-Cruz's salary. Although the University Statutes at Fordham have since been amended to allow negotiation, at the time of hiring, of the number of years' credit to be granted, that amendment is irrelevant in this dispute because it is not retroactive and thus does not affect faculty members hired before its effective date in October of 1979. Moreover, at no time did Hernandez-Cruz ever object to receiving the two years' credit.

In addition to continuing his Ph.D. studies at N.Y.U. and teaching full-time at Fordham, Hernandez-Cruz chose to assume the additional responsibility of teaching part-time at N.Y.U. once again in the spring of 1975. The Fordham University Statutes require the approval of the Vice President for Academic Affairs for a full-time faculty member to teach at another university: the Statutes note that faculty are expected to dedicate their major energies to their obligations at Fordham, and approval is required to assure that outside teaching does not impair the fulfillment of those obligations. Father Bier granted Hernandez-Cruz that approval in January of 1975. Hernandez-Cruz, who received $2,000 in compensation for teaching the additional course, testified that his principal motivation was to avoid seeing the class cancelled at N.Y.U. for lack of an instructor. Also, although it was not required of him, Hernandez-Cruz taught a course at Fordham during the summer of 1975.

During that year of transition between full-time student and full-time instructor, Hernandez-Cruz encountered the first of his several difficulties in obtaining adequate grades in his degree program at N.Y.U. At his request, Hernandez-Cruz received a year-long extension on January 6, 1974 for completion of the requirements for his Statistics II course. On May 28, 1975, he was told that he had only received a C + in the course, and a grade of B or better was necessary for graduate credit. Therefore, he was required to take a special examination in the subject. After unsuccessfully protesting the grade, he took the special examination and satisfied the Statistics requirement in July of 1975.

Hernandez-Cruz could never have doubted the importance of his Ph.D. in his eventual review for tenure. The University Statutes provide that faculty without a terminal degree can hold only the post of Instructor, and the parties have stipulated that the Ph.D. is the proper terminal degree in Hernandez-Cruz's field of sociology. Thus, the Ph.D. was essential for his promotion to the post of Assistant Professor. The University Statutes also provide that "tenure is granted only to faculty of the rank of Professor, Associate Professor, or Assistant Professor."

It therefore could not have surprised Hernandez-Cruz when his reappointment as an Instructor at Fordham for the 1975–1976 academic year included strong encouragement for him to advance his studies. The letter of reappointment from Father Bier on February 26, 1975 stated: "We are unable to offer you more than a one-year contract renewal because you have not obtained your doctoral degree. Subsequent reappointments will depend upon satisfactory progress toward this degree."

Chairperson Gonzales-Gonzales was denied tenure in the spring of 1975, and his final contract was scheduled to expire in January of 1976. This left Hernandez-Cruz as the only full-time faculty member in the Puerto Rican Studies Department, and accordingly there was some discussion that he might succeed Gonzales-Gonzales as chairperson. In June of 1975, however, Hernandez-Cruz wrote to Gonzales-Gonzales to stress that he had no interest in the position and that it had never been offered to him. Hernandez-Cruz sent copies of that letter to

Dean Shea and El Pueblo, the Puerto Rican student organization at the College at Lincoln Center. On July 1, 1975, Dean Shea requested that Hernandez-Cruz serve on a faculty committee that would conduct a search for a replacement chairperson for Gonzales-Gonzales. Hernandez-Cruz replied the next day that he was "glad to join the faculty group." Although there is some dispute regarding the time commitment involved in serving on that committee, the chairman of the committee, Professor Peter Schneider, stated that the committee's task was completed in approximately 25 to 35 hours over the course of the year. The committee first recommended Jose Luis Monserrate for the post, but Dean Shea did not accept the recommendation; the Puerto Rican Studies Department thus remained without a chairperson and without one of its two full-time faculty positions.

Two other events complicated the administration of the Puerto Rican Studies Department in the 1975–1976 academic year. First, Fordham was attempting a resolution of the continuing organizational inconsistency between the small Puerto Rican Studies Department and the four consolidated divisions. Dean Shea asked Hernandez-Cruz to represent the Puerto Rican Studies Department in the College Council while it discussed the reorganization of the Department. Hernandez-Cruz agreed because he opposed converting the Department into an institute, a step which he believed would reduce the independence of the Department's faculty. Second, Gonzales-Gonzales resigned as chairperson on October 6, 1975 instead of awaiting the termination of his contract in January of the following year. As the only other full-time faculty member, Hernandez-Cruz found himself assuming many of the tasks of the department chair despite his expressed desire not to become chairperson. He testified that he feared the department would suffer if he did not perform those tasks. Dean Shea told Hernandez-Cruz that several Puerto Rican Studies courses would have to be dropped if Hernandez-Cruz did not find replacement instructors for Gonzales-Gonzales; so Hernandez-Cruz found an adjunct instructor to assume part of the burden, and he taught an extra course in the spring of 1976 for which he received additional pay from Fordham.

Dean Shea continued to encourage Hernandez-Cruz to assume the leadership of the Department. During the early days of 1976, he met with Hernandez-Cruz, and the latter agreed to administer the Department for one month. Then, in February, Shea offered him the acting chair of the Department. Finally, at the end of February when no new administrator had been found, Shea met with Hernandez-Cruz and, in response to Hernandez-Cruz's concerns that the acting chair would take too much time from his Ph.D. studies, assured him that he would do everything in his power to obtain a leave of absence and a faculty fellowship for Hernandez-Cruz if he would assume the acting chair.

Faculty fellowships, Fordham's equivalent to a sabbatical, allow faculty members to leave for one semester at full pay or two semesters at half pay and perform independent research. Because they represent a substantial investment in the individual faculty member, fellowships are usually granted only to those with substantial ties to the university. Thus, tenured faculty members are much more likely to receive fellowships than nontenured ones. More important, since 1974, no faculty fellowship has been granted for the purpose of advancing work on a doctoral degree. That is true for two reasons. First, instructors without terminal degrees are viewed as more likely to leave Fordham eventually. Second, Fordham does not want to assist some nontenured faculty in competing for tenure against other nontenured faculty. The only demonstrated instance where a faculty fellowship was granted for the purpose of advancing doctoral study involved Professor Ann Manion, a *tenured* faculty member who had not yet received her Ph.D.; she had been tenured in 1967 when the A.A.U.P. system of tenure evaluation was initially adopted at Fordham. The President of the University is ultimately responsible for making all faculty fellowship awards, although the princi-

pal determinations are made by a committee of faculty appointed each year. The deans of each college recommend and evaluate the applicants from their respective colleges.

Hernandez-Cruz suggested at various points in his trial testimony that Dean Shea had promised him a faculty fellowship in return for assuming the acting chair. Independent of Hernandez-Cruz's failure to include a state-law claim in his complaint that might provide a basis for recovery on such an agreement, the evidence at trial simply does not support that allegation. Hernandez-Cruz admitted on cross-examination that he was always aware of the committee nature of the fellowship appointment and that Dean Shea told him that the committee generally did what Shea recommended. In no way does such a statement support Hernandez-Cruz's asserted belief that Shea had promised to deliver a fellowship. Rather, Shea was promising his support for Hernandez-Cruz's application.

With the assurance of Shea's support in seeking a fellowship but no absolute guarantee of receiving one, Hernandez-Cruz accepted the position of acting chair of the Puerto Rican Studies Department. He received a letter from Father Bier officially appointing him to that position on March 25, 1976. Hernandez-Cruz received an additional stipend for his services in that post.

Meanwhile, on December 12, 1975, Hernandez-Cruz was reappointed as an Instructor at Fordham for the 1976–1977 academic year. Father Bier's reappointment letter again raised the issue of the terminal degree requirement: "We are unable to offer you more than a one-year reappointment because you have not obtained your doctoral degree. In this connection, you should perhaps confer with the Dean relative to the advisability of applying for a leave of absence in order to enable you to make more rapid progress toward the completion of your degree requirements."

On March 17, 1976, Hernandez-Cruz wrote to Dean Shea requesting late consideration for a faculty fellowship and a leave of absence for the 1976–1977 academic year.

He had originally desired the leave in 1977–1978, but had learned that leaves were generally not granted in the sixth year of service. He noted in his request to Dean Shea that such a leave would have the effect of postponing his evaluation for tenure until the spring of 1979 instead of the spring of 1978 as originally scheduled. He also noted that the fellowship and leave would allow him to regain his momentum toward obtaining his Ph.D., which he described as "an essential part of my tenure requirements."

Dean Shea discussed Hernandez-Cruz's request with Father Bier, and they concluded to allow him to take the leave in the 1977–1978 academic year as he had originally desired. In a letter dated April 5, 1976, Shea communicated this decision to Hernandez-Cruz, noting that the leave of absence would indeed postpone his tenure review until the spring of 1979. After discussing the leave of absence, he observed: "You may also apply for a faculty fellowship for the same period. I cannot, of course, predict at this point whether this fellowship would be granted. I can assure, however, that it would be given the same consideration as those of other applicants." He also offered to help Hernandez-Cruz find outside funding for his leave, an offer to which Hernandez-Cruz did not respond.

On May 14, 1976, the search committee for the new Chairperson of the Puerto Rican Studies Department recommended Janice Gordils, who was to receive her Ph.D. the following month. She was ultimately appointed to the chair, and relieved Hernandez-Cruz of his duties in administering the department in September of 1976. Thus, Hernandez-Cruz served as acting chairperson for only eight months, three of which were during the summer.

On May 25, 1976, after the College Council had failed to propose an alternative, Vice President Reiss issued a memo to Dean Shea which transformed the Puerto Rican Studies Department into the Puerto Rican Studies Institute. The new Institute continued to offer a major course of studies and was listed in the catalogue. In place of the old Department's chairperson, the Insti-

tute had a director who would report directly to the Dean of the College. It also had an advisory committee comprising the faculty who taught in the Institute and some of its students. The Institute controlled its own curriculum and the assignment of faculty for its courses, but all faculty members in the Institute had to be reappointed to one of the divisions of the College by September 1, 1976. The appointment, reappointment, tenure, and promotion decisions affecting Institute faculty became the responsibility of the individual faculty members' divisions. To protect the existing Puerto Rican Studies Department faculty from the university statute which restricted the grant of tenure in divisions in which 60% of the faculty were already tenured, Vice President Reiss's reorganization plan suspended the operation of the 60% rule for Puerto Rican Studies faculty for five years, by which time all of the existing Puerto Rican Studies faculty would have already been evaluated for tenure.

On June 28, 1976, Hernandez-Cruz was reappointed for the 1977–1978 academic year. Reappointment is necessary even if a faculty member intends to take a leave of absence. As required by Vice-President Reiss's reorganization plan, the new appointment was, as of September 1, 1976, in the Division of Social Sciences because that division included Hernandez-Cruz's discipline of sociology. As in the two previous reappointments, Father Bier stressed "the need to complete your doctoral requirements prior to the time when a tenure decision will be called for in your case."

But even as Father Bier wrote those words, Hernandez-Cruz was encountering further difficulties in completing his Ph.D., and he had found it necessary to abandon his original topic for his dissertation. In addition to course requirements, nearly all Ph.D. programs require a dissertation: an extensive piece of research which makes an original contribution to existing knowledge in the field. Dissertations are completed under the guidance of a Ph.D. candidate's "mentor," an instructor with special expertise in the field. They are generally of book length and may consume years of re-

search and writing. Hernandez-Cruz had initially intended to write his dissertation on the education of Puerto Ricans in the United States, consistent with his Master of Education degree; he developed a preliminary dissertation proposal entitled "College Adjustment of 'Culturally Deprived' Minority Group Students: The Puerto Ricans" in the fall of 1975. He testified that he abandoned that topic in the spring or summer of 1976 when it became clear that the subject was highly quantitative and therefore would require extensive statistical analysis. He then developed a second topic, "Sex Role Changes in Cuba," based upon initial research he had performed in a seminar with Dr. Carolyn Ethridge at the N.Y.U. Sociology Department in the fall of 1975. That second topic was qualitative in nature and thus would not require statistical analysis; it was also a timely subject, since Cuba was considering the adoption of a new family code.

In the fall of 1976, Hernandez-Cruz applied for a faculty fellowship to accompany the leave of absence of 1977–1978 that Dean Shea and Father Bier had previously approved. He intended to use the time and fellowship money to travel to Cuba and monitor the debate surrounding the adoption of the new family code. Dr. Roche and Dr. Gordils each wrote recommendations for Hernandez-Cruz's application. Dean Shea also submitted a favorable report; he observed that, although Fordham's policy usually was to deny fellowships to those without doctorates, Hernandez-Cruz's assistance with the Puerto Rican Studies Institute had kept it alive at a difficult time. On a ten-point scale of increasing priority, Dean Shea ranked Hernandez-Cruz's application as a nine.

However, President Finlay and the faculty committee that made fellowship recommendations to him adhered to the University's policy of granting fellowships only to tenured faculty with terminal degrees: on January 14, 1977, Father Bier informed Hernandez-Cruz that he had been denied the faculty fellowship. Forty-five faculty members applied for fellowships for all or

part of the 1977–1978 academic year, and twenty-four received them. Of those twenty-four all held terminal degrees, and all but one was tenured; the faculty fellowship awarded to the nontenured faculty member was expressly contingent upon his receipt of tenure during the interim, an event which did, in fact, occur.

Hernandez-Cruz complained to Father Bier in a letter of February 24, 1977 that the University had overlooked his contributions to the Puerto Rican Studies Institute when it denied him a fellowship. He also stated that the lack of a fellowship made it necessary for him to decline the leave of absence until the spring of 1978. From his discussions with Dean Shea, Hernandez-Cruz was aware that even a semester-long leave of absence would postpone his tenure consideration for a full year. Although he had never pursued Dean Shea's offers of assistance in finding alternative funding, Hernandez-Cruz then attempted to find such funding for his research. However, because he had not applied for funding until a few months before his intended departure to Cuba and because his research involved travel to a country which did not maintain diplomatic relations with the United States, Hernandez-Cruz was unable to find funding.

The inability to afford travel to Cuba was not the only impediment to Hernandez-Cruz's completion of the sex-role topic: Dr. Ethridge, the professor at N.Y.U. who was Hernandez-Cruz's mentor on the sex-roles topic, had left N.Y.U. Lacking the guidance of a professor with particular specialization in the field of his research, Hernandez-Cruz could not complete his dissertation without finding a new mentor interested in his topic or finding a new topic to suit a new mentor. He chose the latter course. By March of 1977, Hernandez-Cruz had abandoned the sex-roles topic and had begun research on his third dissertation topic, which he was writing at the time of trial, entitled "A Perspective on Return Migration: The Puerto Ricans in New York."

Meanwhile, because his grades in two required Research Methods Courses had not been sufficient for graduate credit, Hernandez-Cruz had taken a special departmental examination in Research Methods as he had done in Statistics two years before. On February 17, 1977, N.Y.U. notified him that he had failed to achieve the required grade on that special examination, thus compounding his difficulties in obtaining his doctoral degree. Herbert Menzel, Director of Graduate Studies at N.Y.U., informed him that he could have one more opportunity to take a special departmental examination, but that it would be necessary for Hernandez-Cruz to postpone his comprehensive Ph.D. examinations until the fall of 1977. Thus, because of poor grades in his course work, Hernandez-Cruz would probably have been unable to travel to Cuba during the 1977–1978 academic year even if he had received the necessary funding. Hernandez-Cruz scheduled his third attempt to satisfy N.Y.U.'s Research Methods requirement for January 30, 1978 and took the examination on that date.

Although even a one-semester leave of absence would have postponed his tenure consideration for a full year, Hernandez-Cruz did not take the leave that was offered to him. When reappointing him as an instructor at Fordham for the 1978–1979 academic year, Father Bier once again stressed in the clearest possible language the importance of completing the doctoral degree: "In offering you this reappointment, I wish to call your attention to the fact that it will automatically bring up a tenure decision in your case in the Spring of 1978. Without the doctoral degree, a favorable tenure decision would almost certainly not be possible." In a letter dated January 3, 1978, Hernandez-Cruz was officially informed that he would be reviewed for tenure that spring.

Realizing the impending gravity of his situation, Hernandez-Cruz met with Dean Shea to discuss any alternatives that would postpone his consideration for tenure. Hernandez-Cruz had hoped that he would be appointed to one of several administrative positions, while retaining an adjunct teaching position; he had heard of several facul-

ty members who had done this in the past. In fact, however, two of the three faculty members in recent memory who had moved from faculty to administration had been denied tenure before the shift in roles and thus did not achieve any postponement in tenure review; the third did achieve a two-year postponement, but he was ultimately denied tenure. Dean Shea told Hernandez-Cruz that the administration was not a pasture for nontenured faculty members who needed time to complete terminal degrees, that distinct qualifications were sought for administrators, and that such a method of avoiding tenure review would be, in any event, an unseemly end-run around the University Statutes. Apparently convinced by Dean Shea's argument, Hernandez-Cruz did not then, nor did he ever, apply for any administrative position with Fordham.

Hernandez-Cruz then discussed with Dean Shea an alternative which he concluded was his best option: he would not apply for tenure and hope to be appointed to an adjunct faculty position. Although there was no guarantee that such an appointment would be forthcoming, this alternative would have given him time to complete his degree. He could then apply for reappointment as a full-time faculty member, which would have required an immediate grant of tenure. Dean Shea noted that requesting an immediate grant of tenure was a risky move that was seldom successful, but Hernandez-Cruz apparently found it the most appealing option. He announced his intention not to apply for tenure in a memo to the tenure committee and Dr. Roche dated February 11, 1978.

On February 17, 1978, Dr. Menzel of N.Y.U. informed Hernandez-Cruz that he had once more failed the Special Departmental Examination in Research Methods. Moreover, Dr. Menzel told Hernandez-Cruz that he could not take the examination again and that he was accordingly dropped from N.Y.U.'s Ph.D. program. Dr. Menzel did, however, outline the procedures for reapplying for candidacy.

Instead of following those procedures, Hernandez-Cruz sought a reevaluation of his grade. His petition to the Special Departmental Examination Committee alleged many of the traditional rationalizations of a dissatisfied student: the time given for the examination was inadequate, the examination did not indicate the point value of its sections, one section of the exam was "not suitable for an in-class examination," and the graders were not aware of Hernandez-Cruz's past deficiencies or of his past theoretical differences with the instructor. By letter of April 11, 1978, the Committee rejected his request for review and directed that he follow Dr. Menzel's original instructions to reapply for candidacy.

Hernandez-Cruz's plans for postponing tenure review had become complicated in the meantime by the legal effect of his decision not to apply for tenure: Father Bier told Hernandez-Cruz by letter that his decision not to apply was equivalent to resignation. Although Hernandez-Cruz maintained at trial that he was greatly disturbed by the idea of resignation because he had never resigned from anything in his life and did not view himself as a quitter, other evidence indicates that his principal concern was that he would be unable to collect unemployment insurance if his termination was characterized as a resignation. Hernandez-Cruz himself testified that he would not have applied for tenure when he did if the University had been willing to label his departure as something other than a resignation. Moreover, in Dean Shea's presence, Hernandez-Cruz telephoned Father Bier, and Dean Shea testified that unemployment insurance was the only issue discussed.

Therefore, in an effort to preserve his unemployment insurance, Hernandez-Cruz abandoned his previous intentions and wrote to Father Bier on April 21, 1978 to request late consideration for tenure. Father Bier responded affirmatively to the request for late consideration but stressed that Hernandez-Cruz would have to assemble his tenure application quickly to allow the tenured faculty members in the Social Sciences Division to review the application before the end of the academic year.

Thus, Hernandez-Cruz compiled two applications in May, 1978: one to the Admissions Committee of the N.Y.U. Sociology Department and one to the Tenure Committee of the Fordham Social Sciences Division. For his tenure application to Fordham, he assembled many letters of recommendation from students, faculty members at Fordham and elsewhere, and leaders in the New York Puerto Rican community. He also submitted manuscripts of his publications and unpublished papers. He was unable to provide documentation that he had received approval from N.Y.U. for his third dissertation topic, although he asserted that unofficial approval had been obtained. Given his status at N.Y.U., however, as demonstrated by his simultaneous reapplication for degree candidacy, the status of his final dissertation topic appears irrelevant.

Dr. Roche, as Chairperson of the Social Sciences Division, assembled a file for Hernandez-Cruz's application to be reviewed by the Division's tenured faculty members. The file included Hernandez-Cruz's own submissions, student evaluation reports from Hernandez-Cruz's classes, and Dr. Roche's notes of interviews with several of Hernandez-Cruz's students. Dr. Roche also asked Dr. Gordils, as Director of the Puerto Rican Studies Institute, to speak briefly at the tenure committee meeting. Because she saw her role as a representative of the Institute, not as an individual offering her own views, she requested all members of the Puerto Rican Advisory Council to submit recommendations. When she appeared before the tenure committee on May 18, 1978, she submitted the resulting recommendations from El Pueblo and from one of the Institute's two adjunct faculty members. The ensuing discussion between Dr. Gordils and the tenure committee covered, among other subjects, the availability of replacements for Hernandez-Cruz in his role in the Institute and the difficulties surrounding his application for a faculty fellowship.

After speaking with Dr. Gordils, the tenure committee discussed Hernandez-Cruz's application and then voted, by an eleven-to-one margin, to deny tenure. Each faculty member later completed a recommendation form reviewing the merits of Hernandez-Cruz's application and giving reasons for the tenure vote.[1] Dr. Roche also submitted a recommendation on behalf of his division which both included his own observations and summarized the views that his colleagues had expressed in discussion.[2] Both Dr. Roche's report and those of the individual tenure committee members indicate that they thoroughly reviewed Hernandez-Cruz's application and his assertions of unfairness in the faculty fellowship rejection but determined that, above all, his failure to complete his terminal degree made him an inappropriate candidate for tenure.

Three aspects of a candidate's performance are considered when being reviewed for tenure at Fordham: teaching, scholarship, and service to the university and the community. The reports of Dr. Roche and the other tenure committee members reveal that they generally viewed his teaching record as, in the words of one committee member, "good, though not outstanding." Many of the reports mention Hernandez-Cruz's dedication to student counseling and his participation in a number of university

1. Over Fordham's objection, the court granted the plaintiff access to redacted copies of these individual tenure committee reports. Subject to a protective order limiting redistribution, the plaintiff received retyped copies of the contents of each report with the name of the author, and any comments that would identify the author, removed.

2. Dr. Roche's division report includes, among many reasons for denying tenure, a statement that 60% of the Division's sociologists were already tenured. He testified that he was aware that, under Vice President Reiss's reorganization plan for the Institute, Puerto Rican Studies instructors were not to be limited in their tenure opportunities by the 60% restriction. Accordingly, Dr. Roche testified that he did not intend to rely on the tenure percentage as a basis for his negative recommendation. This possible inconsistency is of no significance. Even if Dr. Roche did rely on the 60% figure, it is clear from his report and those of the committee members that it was Hernandez-Cruz's publication record and his poor progress on his dissertation that destroyed his chances for a favorable recommendation.

committees. Hernandez-Cruz testified that Puerto Rican instructors feel a special need to participate actively in university affairs both because the university wants Puerto Rican representation and because the instructors themselves sense a special calling to assist minority students in career and academic planning. Hernandez-Cruz's participation in minority pre-medical programs, affirmative action liaison committees, and the Puerto Rican Studies Institute itself revealed that dedication. The tenure committee members also noted in many cases that his service to the Puerto Rican community in New York had been vigorous and consistent, comprising much editorial publication in Spanish newspapers and leadership in journalistic, artistic, and cultural organizations.

On the other hand, the committee reports reveal dissatisfaction with Hernandez-Cruz's scholarly endeavor, most particularly with his dissertation progress. His publication record was described as "minimal" and insignificant; he had published nothing in the four years preceding his tenure application, and the majority of his work before that was published in newspapers of general circulation rather than scholarly journals. Although, as Dr. Roche testified, some faculty members have received positive tenure recommendations with less impressive publication records, none has received a positive recommendation with so few publications when combined with such uncertain progress toward a terminal degree. In light of the University Statutes providing that tenure is normally granted only to faculty who hold terminal degrees, the tenure committee reports indicate that nothing in Hernandez-Cruz's performance at Fordham compensated for that critical shortcoming. Nearly all of the reports observe that he had made no substantial progress toward completing his dissertation and had little prospect of completing the degree in the foreseeable future.

As required by the University Statutes, Dr. Roche and the individual tenure committee members forwarded their reports separately to Dean Shea to assist him in preparing his recommendation to the Vice President for Academic Affairs, Father Bier. Dean Shea, concurring in the committee's recommendation, did not recommend tenure for Hernandez-Cruz. He stated that there was no "special circumstance which would argue for waiving the terminal degree requirement." Father Bier agreed with the negative recommendation, submitted it to President Finlay, and informed Hernandez-Cruz in a letter dated May 31, 1978 that he would not be recommended for tenure to the Board of Trustees.

In a letter dated the same day, Dr. Menzel of N.Y.U. informed Hernandez-Cruz that he would be readmitted to the Ph.D. program subject to a series of conditions, including the achievement of a passing grade in another Field Methods examination which would be written by different instructors than the one who taught the original course. Dr. Menzel also warned Hernandez-Cruz that his Ph.D. requirements would have to be completed in time for a June 1982 degree—a deadline which continued to apply at the time of trial.

On June 27, 1978, Hernandez-Cruz wrote to Father Bier and requested a written explanation of the denial of tenure in his case, an account of the committee vote, and a list of items in his file. Father Bier responded by letter, stating that the University Statutes provide that the reasons for not granting tenure were to be given first in conference with the Academic Vice President and then could be given in writing. Father Bier and Hernandez-Cruz held that meeting on July 18; and the next day, in response to Hernandez-Cruz's request, Father Bier sent him a letter repeating Dr. Roche's statement of reasons advanced by the tenure committee for not recommending tenure.

Hernandez-Cruz then turned to his next recourse under the University Statutes: the Faculty Tenure and Reappointment Review Committee. In a letter of July 26, 1978 to Reverend Joseph A. Novak, Chairman of the Committee, he requested "reconsideration of the tenure decision" in his case,

alleging a series of procedural errors in the consideration of his application. On November 14, 1978, Hernandez-Cruz wrote to Rev. Novak once again, offering further evidence regarding his denial of a faculty fellowship a year and a half earlier. He presented further evidence on January 1, 1979.

On February 13, 1979, the Faculty Tenure and Reappointment Review Committee issued a five-page, single-spaced report of its investigation which concluded that "there was no substance to the grievance." More particularly, it concluded that the tenure committee consulted all essential sources of information in reaching its recommendation, that Hernandez-Cruz had adequate time to prepare his application, and that there was no evidence that the committee allowed arbitrary or improper reasons—particularly racial prejudice—to influence its recommendation.

On May 2, 1979, Hernandez-Cruz initiated his final appeal of his tenure decision under the University Statutes, which provide that, if the President wishes to confer tenure on someone whom the dean has not recommended, he may refer the matter to the Faculty Senate. The President cannot, however, recommend anyone for tenure without the endorsement of either the dean or the Faculty Senate. The plaintiff has introduced evidence of two instances where this procedure was employed after a tenure candidate had received a negative recommendation from the tenure committee. In both of those instances, however, both the Dean of the School and the Vice President for Academic Affairs had disagreed with the committee and had urged the President to recommend the candidate to the Faculty Senate. Such did not occur with Juan Hernandez-Cruz's application: both Dean Shea and Father Bier agreed with the tenure committee in not recommending tenure. After reviewing the applications, recom-

mendations, and reports in Hernandez-Cruz's file, President Finlay rejected his request for reconsideration on May 25, 1979.

Hernandez-Cruz's terminal contract with Fordham expired August 31, 1979. Despite extensive application to universities and colleges in a variety of locations, he remained unemployed until September 1, 1980, when he began a one-year appointment at Brooklyn College. He did, however, finally satisfy his Research Methods requirement at N.Y.U.; and, at the time of trial, he had completed several chapters of his dissertation on his third topic.

Hernandez-Cruz has failed to present a *prima facie* case of employment discrimination under Title VII.[3] Under the test enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Hernandez-Cruz must demonstrate four conditions: first, that he is a member of a racial minority; second, that he applied for tenure and was fully qualified for tenure; third, that the University denied his application; and fourth, that the University continued to accept applicants for tenure and grant tenure to applicants with his qualifications after rejecting him. *See also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 249–55, 101 S.Ct. 1089, 1092–94, 67 L.Ed.2d 207 (1981). As the court of appeals observed in *Lieberman v. Gant*, 630 F.2d 60 (2d Cir. 1980), the qualifications that a plaintiff must demonstrate when complaining of discrimination in the denial of tenure are not merely those necessary for continued reappointment as a non-tenured faculty member. Instead, the grant of tenure involves a virtual life-long commitment and therefore stricter standards for selecting among candidates.

Hernandez-Cruz has failed to satisfy both the second and fourth parts of the *McDonnell Douglas* test because the evidence clearly establishes that a terminal degree was, in fact, a requirement for tenure at

---

**3.** Although the plaintiff's complaint includes a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, he has introduced no evidence at trial to demonstrate that the University receives federal financial assistance or that the primary purpose of that assistance is to provide employment. In any event, even if the plaintiff has not abandoned the Title VI claim, the proof in this case would almost certainly fall short under that claim as well, assuming that a private cause of action existed for the relief the plaintiff seeks.

Fordham.[4] The parties stipulated that Hernandez-Cruz lacked his terminal degree and that he was denied tenure because he lacked that degree. At no time since Hernandez-Cruz joined the faculty as a full-time member has anyone received tenure who lacked a terminal degree in the appropriate field. Indeed, the most recent instance of anyone receiving tenure without a terminal degree was in 1967 when Fordham adopted the A.A.U.P. principles and radically altered its employment-security system. The testimony and the documents in this case lead unavoidably to the conclusion that Hernandez-Cruz's lack of a Ph.D.—and not his race or origin—caused Fordham to deny him tenure.

Nor is there any question that Hernandez-Cruz was unaware of this requirement. Every reappointment warned him of the importance of the degree to his future at Fordham. On at least two occasions he himself referred to the Ph.D. as an "essential" qualification in his tenure review. *Cf. Powell v. Syracuse University*, 580 F.2d 1150 (2d Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1979) (plaintiff not informed that she was performing inadequately).

This court cannot accept Hernandez-Cruz's claims that Fordham somehow violated Title VII either (1) by encouraging him to assume duties which he now asserts impaired his dissertation progress or (2) by not providing him with a faculty fellowship or some other means of postponing his tenure consideration. The critical failure of both of those arguments is causality: there is insufficient evidence from which this court could conclude that Hernandez-Cruz

would have completed his doctoral degree in time for his tenure consideration even without extracurricular duties and with a fellowship. As the facts demonstrate, Hernandez-Cruz had not obtained his Ph.D. by May of 1978, and had not obtained it at the time of trial, for an array of reasons and contingencies beyond Fordham's control.

More specifically, the duties of which Hernandez-Cruz complains were not shown to be extraordinary ones for full-time faculty at Fordham. The University Statutes define faculty duties to include—in addition to teaching, testing, and grading—regular academic counseling, scholarly research and publication, participation in learned societies, and service on university committees. Although Hernandez-Cruz undoubtedly contributed greatly to University activities outside of the classroom, he has failed to show that other nontenured faculty faced lesser burdens. As Dr. Gordils testified, nontenured faculty members must make painful choices to set proper priorities for their time, and completion of the Ph.D. should have been Hernandez-Cruz's highest priority. Instead, in addition to his many activities at Fordham, Hernandez-Cruz elected a number of obligations that Fordham did not specifically encourage, most notably his continued teaching at other universities. He simply failed to establish proper priorities for his professional time.

The court does not overlook the exceptional dedication of Hernandez-Cruz to the Puerto Rican Studies Institute, to Puerto Rican students at Fordham, and to New York's Puerto Rican community. But this court has no power to hold that Fordham

---

4. Although there may be some dispute over the wisdom of the terminal degree as a requirement for university faculty, the documents of this case reveal at least one academician who, despite vocal support for Hernandez-Cruz in his tenure battle, was willing to reject him later in favor of an applicant with a terminal degree. Maria Sanchez, Chairperson of the Department of Puerto Rican Studies at Brooklyn College, wrote to President Finlay of Fordham after learning that Hernandez-Cruz would not be granted tenure. She wrote on behalf of the Department's faculty to express their dismay: ". . . to deny Professor Hernandez-Cruz his

right to tenure is to intentionally deter a brilliant career unconditionally committed to the academic betterment of the programs and departments of Puerto Rican Studies throughout the United States." The following summer, however, after Hernandez-Cruz had applied for a full-time teaching position in her department, she replied: "I regret to inform you that the Department of Puerto Rican Studies, after careful consideration of all available candidates, has decided to offer the position of assistant professor to someone who holds a doctoral degree."

must accept such good works as a substitute for what it has required of all other candidates for tenure. The allocation of the scarce resources of private universities, such as fellowship grants and tenured faculty posts, must be left to the discretion of their faculties and administrations, absent evidence of illegal discrimination.

Finally, Hernandez-Cruz's argument that he should have received a faculty fellowship or been offered an administrative position in order to postpone his tenure consideration presumes that Fordham had an obligation to find some extraordinary means to retain him on the faculty. In *Texas Department of Community Affairs v. Burdine, supra,* however, the Supreme Court established that no such obligation exists: "Title VII ... does not demand that an employer give preferential treatment to minorities ... It does not require the employer to restructure his employment practices to maximize the number of minorities." 450 U.S. at 259, 101 S.Ct. at 1096–97. Similarly situated faculty members have only once been offered an administrative job where it had the effect of postponing tenure, and Hernandez-Cruz has never even applied for such a job; similarly situated, nontenured faculty members have never received faculty fellowships to complete their doctoral studies. Fordham was under no obligation to create exceptions to its own statutes and practices in order to assist Hernandez-Cruz to achieve tenure.[5]

Accordingly, the complaint is dismissed and judgment is granted for the defendant.

---

**5.** The plaintiff has suggested that Fordham's tenure policies have a disparate effect upon Puerto Ricans and are therefore discriminatory in the application though not on their face. That argument must fail for lack of evidentiary support: the scattered evidence that some Puerto Rican instructors have not received tenure (particularly when combined with the fact that at least one Puerto Rican instructor has) does not demonstrate that Puerto Ricans have been harmed disproportionately by those policies. *See Townsend v. Nassau County Medical Center,* 558 F.2d 117 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1979).

Similarly, this court must reject the plaintiff's suggestion that the University's manage-

This opinion constitutes the court's findings of fact and conclusions of law as required by Rule 52.

ment of the Puerto Rican Studies Institute indicates a discriminatory motive that can be extended by implication to the plaintiff's case. By transforming every revision of a minority studies program into a basis for inferring discriminatory intent, such an approach would effectively prohibit a university from treating minority studies programs like any other course of study. In any event, the transformation here from the Puerto Rican Studies Department to the Institute was entirely consistent with the transformation of the entire College at Lincoln Center from many departments into four broad divisions, and it provides no evidence of a discriminatory motive on the part of Fordham's administration.