Anthony E. JIMINEZ, Plaintiff–Appellee,

v.

MARY WASHINGTON COLLEGE;
Philip Hall, Defendants–
Appellants.

Anthony E. JIMINEZ, Plaintiff–
Appellant,

v.

MARY WASHINGTON COLLEGE;
Philip Hall, Defendants–
Appellees.

Nos. 94–1776, 94–1802.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1995.

Decided June 9, 1995.

**ARGUED:** Guy Winston Horsley, Jr., Senior Asst. Atty. Gen., Office of the Atty. Gen., Richmond, VA, for appellants. Sa'ad El–Amin, El–Amin & Crawford, P.C., Richmond, VA, for appellee. **ON BRIEF:** James S. Gilmore, III, Atty. Gen. of Virginia, Office of the Atty. Gen., Richmond, VA, for appellants.

Before WILKINS and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Reversed by published opinion. Judge HAMILTON wrote the opinion, in which Judge WILKINS and Senior Judge PHILLIPS joined.

## OPINION

HAMILTON, Circuit Judge:

Anthony Jiminez (Jiminez), a black professor from Trinidad, West Indies, instituted suit pursuant to Title VII of the Civil Rights Act of 1964, see 42 U.S.C.A. §§ 2000e—2000e–17 (West 1994), and 42 U.S.C.A. §§ 1981, 1983 (West 1994), against Mary Washington College and Philip Hall (Hall), Vice President of Mary Washington College (collectively MWC), for alleged employment discrimination based on race and national origin. According to Jiminez, he was impermissibly given a terminal contract instead of remaining in a tenure-track teaching position. Following a bench trial, the district court rendered judgment in favor of Jiminez, ruling that he had established a *prima facie* case of race and national origin discrimination, and he had demonstrated MWC's proffered reason for the adverse action was pretextual and unworthy of credence. MWC appeals, contending that the district court erred in ruling in favor of Jiminez, and Jiminez cross-appeals, asserting that the damages are inadequate. Concluding that the factual findings of the district court are clearly erroneous, we reverse. Given our disposition, Jiminez' cross-appeal is moot.

### I.

### A.

Jiminez applied for an assistant professorship in the Department of Economics at MWC on March 4, 1989. In connection with his application, Jiminez represented that he would receive his doctorate degree (Ph.D.) in economics in June of 1989 from the University of New Mexico. A divided Economics Department extended Jiminez an offer, even though he was not the most qualified applicant; he only met MWC's minimal standards. The department was split in its decision to offer Jiminez a position since he garnered inauspicious evaluations at the University of New Mexico. Despite this knowledge, MWC offered Jiminez the position because the college was seeking to increase the number of blacks on its faculty. To a degree, therefore, Jiminez was hired because he was black. By letter dated August 3, 1989, William Anderson (Anderson), President of MWC, notified Jiminez of MWC's offer, expressly explaining that Jiminez' appointment was "contingent upon [his] being granted [his Ph.D.] by August 16, 1989." (J.A. at 496). This contingency reflected MWC's policy applicable to Jiminez that professors seeking tenure have terminal degrees, as reflected in the faculty handbook, which provided that for consideration for promotion to assistant professor "[p]ossession of the appropriate earned terminal degree, in most cases, the Doctorate in one's discipline (in unusual circumstances, equivalent professional achievement)" was necessary. *Id.* at 511. Thus, on extension of the offer, Jiminez was aware that obtaining his Ph.D. was necessary for promotion. In this respect, Jiminez' offer differed from that of his colleague in the Economics Department, Professor Steve Greenlaw (Greenlaw), because according to the 1982 faculty handbook in effect when Greenlaw was hired, attaining a terminal degree was not a prerequisite for advancement. Thus, Greenlaw was given tenure even though he did not obtain a terminal degree until 1986.

As a nontenured professor seeking tenure, Jiminez was subject to a six-year probationary period after which he could be awarded tenure. Consistent with MWC's procedures, Jiminez initially was awarded a one-year contract as a newly-hired, tenure-track faculty member. Subsequent to his initial year, a tenure-track faculty member can be awarded a two-year contract, followed by a three-year contract, provided, of course, his performance satisfied MWC's standards. Following successful completion of the three-year contract, a faculty member could be considered for tenure. If a tenure-track professor is not considered for further advancement because of unsatisfactory performance, however, MWC grants him a one-year terminal contract, which expires at the termination of the academic year.

Tenure is based largely on teacher evaluations. The faculty at MWC is evaluated annually according to three criteria: (1) teaching effectiveness; (2) service to MWC; and (3) scholarship or professional activity. Of these criteria, teaching effectiveness is paramount and is based largely on evaluations from students, the department chairman, and other faculty within the department. Scholarship or professional activity includes publication or presentation of scholarly works.

After his first semester of teaching, MWC evaluated Jiminez' performance on February 22, 1990. This evaluation was a compendium of faculty observations, student course ratings, and the annual Faculty Activities Report. The gist of this initial evaluation was that Jiminez' skills as a professor were lacking, but his personal fortitude was commendable. Specifically with respect to the tenure criteria, this evaluation concluded: (1) Concerning teaching effectiveness, "[s]tudents were critical of the clarity and loudness of his voice, his speaking to the chalk board instead of the class, poorly worded tests, and covering material too fast." These negative conclusions were countered by the generic observation that they were "shortcomings any new teacher is bound to have, and are things easily corrected by experience." Additionally, Jiminez was "praised ... for caring about his students, holding review sessions, encouraging questions, and taking the time to make sure students understood the material." *Id.* at 512. (2) Regarding service to MWC, Jiminez was rated highly for his participation in college organizations. (3) Respecting scholarship, the evaluation admonished that Jiminez' "major focus for the immediate future *must* be completion of his dissertation." *Id.* (emphasis added). Significantly, Jiminez neither protested nor contradicted the initial evaluation's conclusions.

On April 2, 1991, MWC again evaluated Jiminez' performance, this evaluation again being an amalgam of the faculty observations, student course ratings, and the annual Faculty Activities Report. Focusing on the three primary criteria for tenure, this second MWC evaluation concluded: (1) With respect to teaching effectiveness, the evaluation reported that while Jiminez was dedicated, his "student evaluation scores [were] below average for both the [Economics] Department and College-wide faculty," but expressing the hope that time would cure this failure. *Id.* at 514. (2) With respect to service, Jiminez again rated highly; and (3) With respect to scholarship, the evaluation observed that Jiminez had attended various meetings. As with the initial MWC evaluation, Jiminez conspicuously took no exception to the conclusions, nor did he request consideration for a merit award.

### B.

Despite a recurrent history of poor evaluations, Jiminez managed to muster some support at MWC: various students wrote letters and met with Hall on Jiminez' behalf. The crux of these letters was that Jiminez was a caring man and a good professor. According to Jiminez, and as found by the district court, some of these letters suggested that Jiminez was the victim of a concerted effort of racial discrimination by some MWC students to have him terminated via poor teacher evaluations. For example, a letter from former student Laura Kasley (Kasley) recited:

It is my understanding that several students have either given Mr. Jiminez poor evaluations, or have written negative letters of complaint concerning his teaching.... Last semester (Fall 91), I ... witnessed, on evaluation day, a collaborative effort on the part of the majority of the students to give Mr. Jiminez a poor evaluation.... It is my opinion that the students in this class, who gave Mr. Jiminez poor evaluations, did not take the time required by the course to fully understand the material.

. . . .

Since the first day of classes, Mr. Jiminez forewarned us to ask him to repeat himself if we couldn't understand his accent.... I have acclimated to his accent and find no trouble understanding him.

*Id.* at 471–72. At trial, Kasley testified as to the allegedly collusive conduct of some students:

Well, it was basically that they were laughing and saying, Yeah, right, this is,

you know, one way, and things like this, to give him the lowest possible score, and I didn't say anything.... I am not sure why many of the students in ... economics class gave Mr. Jiminez poor evaluations, and I question if they knew what they were setting in motion by doing so; I don't think that these evaluations should be taken in [sic] consideration.

*Id.* at 58. Kasley testified further that her opinion of Jiminez was grounded in the fact that he helped her personally a great deal with her work and was accommodating of her schedule. Critically, Kasley testified that students expressed their displeasure with Jiminez' teaching abilities prior to their evaluations, which was not an uncommon occurrence.

A letter from Rachel Holland (Holland) reported that "part of the problem lies with a small group of bigotted [sic] individuals that were in the ... class that I took last semester.... Comments like, 'Let's give him [poor] reviews' echoed around the classroom, in a situation that was not supposed to be a collective effort." *Id.* at 479. Holland's testimony is equivocal in that she stated that "all" students collaborated on giving Jiminez evaluations, but later amended her testimony to reflect that the number of students was approximately ten, nor is there an ascription to the term "bigoted." Condemning these students for asking "irritating questions," Holland opined that these students "decided to thrash Professor Jiminez down" on realizing "that they might not be receiving that 'usual A.'" *Id.* Comporting with Kasley's testimony, Holland testified that she understood Jiminez was slated for a one-year terminal contract prior to the allegedly collusive student evaluations.

Former student Cassondra Thomas (Thomas) wrote that "[a] few negative letters state 'Hire a professor who speaks english.' This is discrimination in its truest form." *Id.* at 481. Nicole Dixon, a student of Jiminez', on being asked at trial if she considered that his student evaluations were racially motivated, responded that they were:

Because comments were made about the way that Professor Jiminez looked. I had other econ classes with the same students.

It's a small department, so we all kind of take the same classes. And the level of respect for any professor, I don't care who it is, it just was not there for him. He come [sic] into class, and they [sic] would be utter chaos. He would give lectures, and they would try to knock him down. And you go to another professor's class, you didn't have to deal with stuff like that.

*Id.* at 68. Student Kristina Bielak stated that while Jiminez had "an 'odd sense of humor,'" she could "not help but wonder if the problems certain people ha[d] with [Jiminez] might be prejudice to some degree for I found him to be a rather competent instructor." *Id.* at 482. Professor Carole Corcoran on March 30, 1992, wrote to Hall stating that "subtle racism" should be taken into account in evaluating Jiminez' faculty and student evaluations. While the instructors in the Economics Department did not attend Jiminez' classes, a professor from another department attended some of Jiminez' classes and gave a positive critique.

In addition to writing letters, six students (Six Students) went to see Hall on April 28, 1992, regarding the alleged "conspiracy" against Jiminez. In his notes on the meeting with these students, Hall wrote "Race. Accent. Mannerisms. Students here are not tolerant," *id.* at 492, and he testified that students "wanted to remind me that there was a possibility that the students had done this because of his race and his national origin, although there wasn't anything in the behavior itself that was racial," *id.* at 335. Given that there was no evidence of racial animus and student evaluations are anonymous, Hall did not conduct an investigation into the allegation that some students had decided to target Jiminez for a terminal contract based on an invidious motive.

### C.

On February 26, 1992, MWC completed Jiminez' third evaluation. Consistent with the two prior evaluations, this evaluation recognized that Jiminez was an ineffective professor whose teaching ability failed to improve, was decidedly substandard, which was, of course, consonant with the unsatisfactory evaluations he received from students at

MWC. Particularly addressing the three primary criteria for tenure, this evaluation revealed: (1) Pertaining to teaching effectiveness, "[Jiminez'] teaching has been somewhat problematic since his first semester at [MWC]." While recognizing that Jiminez was "conscientious" and "very hard working," ultimately the evaluation concluded that his teaching effectiveness was negligible: students complained that Jiminez was "disorganized, has difficulty explaining concepts, gets confused ... does not answer questions well, does not cover much material in a semester, has mystifying grading standards, and ultimately, loses 'control' of the class. These criticisms are also reflected in the numerical scores on [Jiminez'] course evaluations, which are perennially low." *Id.* at 517. This evaluation also noted that Jiminez' scores failed to meet the department and college averages. Despite his positive qualities, the evaluation concluded, with respect to his teaching effectiveness, that Jiminez' "performance has not met the standard we expect for [MWC] faculty." *Id.* (2) Concerning service, the evaluation noted that again Jiminez was an active participant in MWC life. (3) Regarding scholarship, the evaluation reported that while Jiminez had attended two conventions, he failed to obtain his Ph.D., despite the fact that fulfilling this obligation was a prerequisite for tenure and his employment was contingent on this degree being awarded.

Consonant with this third evaluation and Jiminez' student evaluations in general, the three tenured members of the Economics Department, Robert Rycroft (Rycroft), Greenlaw, and Steve Stageberg, unanimously recommended that Jiminez be given a one-year terminal contract rather than considered for tenure, specifically memorializing the bases for their recommendation: (1) For five semesters, students had consistently given Jiminez poor evaluations; (2) Jiminez failed to receive his Ph.D.; (3) A self-conducted survey of the Economics Department revealed that the primary weakness in the department was the teaching quality of specific instructors, and of the twenty responses, seventeen related specifically to Jiminez' shortcomings and a negative comment revealed by the survey concerned a course taught by Jiminez that one faculty member described as very weak and suggested that students no longer take it; (4) Jiminez had no faculty support; and (5) Jiminez experienced difficulty completing material.

Additionally, five white students (Five Students) protested to Rycroft in April of 1991 when Jiminez was substituted to teach a required economics class that Greenlaw had taught in the past. These students complained that Jiminez was a wretched instructor, predicting that the Economics Department would suffer if Jiminez taught this course. Confirming this opinion, for five semesters, Jiminez' student evaluations were the lowest of the approximately forty tenure-track faculty members, and the one semester he was not ranked the lowest, Jiminez ranked thirty-seventh. In light of these concerns, this evaluation recommended that Jiminez be given a one-year terminal contract rather than considered for tenure.

### D.

Despite three consistently unfavorable college evaluations and five semesters of unflattering student evaluations, by the spring of 1992, Jiminez' student evaluations had substantially improved, and this trend continued into the Fall of 1992 and the spring of 1993. Thus, for the sixth, seventh, and eighth semesters, Jiminez' student evaluations improved. Jiminez and the district court attributed this improvement to the fact that the students understood that no more discriminatory collaboration would be tolerated. MWC attributed this unprecedented emendation to Jiminez' students' grades correspondingly, dramatically improving and his class enrollment being exceptionally small—eleven students in 1992 and nine in 1993—as compared with the department average of twenty-six students per class. Regardless of its source, this progress, coupled with the letters and visit by the Six Students to Hall, prompted MWC to modify its recommendation of a terminal one-year contract; accordingly, on May 22, 1993, Hall offered Jiminez a terminal contract, but invited him to reapply for his position provided he satisfied four conditions: (1) substantial improvement in student evaluations; (2) favorable evaluations by colleagues in the Economics Department

as a result of unannounced visits to his classes; (3) defense of his doctorate dissertation; and (4) presentation of a paper at an economics conference. Despite the fact that Jiminez was granted the opportunity to reapply, Hall also explained the reasons that Jiminez failed to remain on the tenure-track: (1) five semesters of decidedly inferior student evaluations, with a significant number of students expressing their unhappiness with Jiminez; (2) failure to defend his dissertation; and (3) failure to produce scholarly work.

### E.

Jiminez declined to reapply, opting instead to institute suit against MWC, alleging that he was discriminated against because of his race and national origin. At the close of his case-in-chief, MWC and Hall moved unsuccessfully for judgment as a matter of law. The district court concluded that Jiminez had established a *prima facie* case of race and national origin discrimination, that MWC had rebutted it, but Jiminez had demonstrated that MWC's reasons for not renewing his contract were both pretextual and unworthy of credence. The basis for the district court's conclusion that Jiminez rebutted MWC's proffered reasons for issuing him a terminal contract was the fact that Greenlaw was given tenure even though he did not receive his doctorate degree until his fourth year at MWC, student evaluations were "tainted by collusion and racial and national origin animus," and thus MWC should have ignored them because of this taint, as well as conducted an "in-depth investigation to determine the extent of the taint." *Id.* at 552. Rather than ignore the tainted evaluations or conduct an investigation, the district court found that MWC merely solicited the opinion of the Five Students that had complained to Rycroft that Jiminez was incompetent. According to the district court, therefore, MWC knowingly relied on tainted information in issuing Jiminez a terminal contract. Finding that Jiminez ultimately carried his burden of proving that he was the victim of invidious discrimination "because he ha[d] proven *both* that [MWC's] 'proffered explanation is unworthy of credence,' and that the reasons given for the adverse action were merely a pretext for discrimination," the district court

entered judgment in his favor. *Id.* at 552. After making this finding, the district court concluded that once MWC offered Jiminez the position, even though he was not the most qualified candidate, MWC "made a commitment to protect [him] from racial and national origin animus." *Id.* at 549.

On appeal, MWC contends that Jiminez was not the victim of invidious discrimination, but was issued a terminal contract because he was an incompetent professor, citing three reasons: (1) he consistently received poor student evaluations; (2) he produced no scholarly work; and (3) he failed to obtain his Ph.D. In advancing this contention, MWC maintains that the district court's factual findings are clearly erroneous, and, given this erroneous predicate, the legal conclusions on which the facts are premised are reversibly flawed.

Jiminez cross-appeals, asserting that the $15,000 in compensatory damages was inadequate.

### II.

### A.

We commence with the premise that while Title VII is available to aggrieved professors, we review professorial employment decisions with great trepidation. *See Fields v. Clark Univ.*, 966 F.2d 49, 54 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 976, 122 L.Ed.2d 130 (1993); *Brousard–Norcross v. Augustana College Ass'n*, 935 F.2d 974, 975–76 (8th Cir.1991); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92–93 (2d Cir.1984); *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980). We must be ever vigilant in observing that we do not "sit as a 'super personnel council' to review tenure decisions," *Brousard–Norcross*, 935 F.2d at 976, always cognizant of the fact that professorial appointments necessarily involve "subjective and scholarly judgments," with which we have been reluctant to interfere, *Smith v. University of North Carolina*, 632 F.2d 316, 345–47 (4th Cir.1980). Aptly articulating this rubric, the Third Circuit cogently cautioned:

[C]ourts must be vigilant not to intrude into [tenure] determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Kunda,* 621 F.2d at 548. The federal courts have adhered consistently to the principle that they operate with reticence and restraint regarding tenure-type decisions. *See, e.g., Bina v. Providence College,* 39 F.3d 21, 26 (1st Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1406, 131 L.Ed.2d 292 (1995); *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir. 1980). Our review is narrow, being limited to determining "whether the appointment or promotion was denied because of a discriminatory reason." *Smith,* 632 F.2d at 346. In other employment contexts, we have explained that Title VII is not a vehicle for substituting the judgment of a court for that of the employer. *See EEOC v. Clay Printing Co.,* 955 F.2d 936, 946 (4th Cir.1992) (noting that the federal courts should "not ... direct the business practices of any company"). Title VII, therefore, is not a medium through which the judiciary may impose professorial employment decisions on academic institutions.

## B.

### 1.

■ Launched from this precept, we now examine the procedural posture of this case and our standard of review. The district court concluded that Jiminez established a *prima facie* case of race and national origin discrimination and thus proceeded to the ultimate issue of whether an unlawful animus or the proffered nondiscriminatory reason for Jiminez' failure to receive tenure constituted the genuine reason for the adverse action. *See McDonnell Douglas Corp.*

*v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Although we express grave doubts with respect to whether Jiminez established a *prima facie* case, given that this appeal comes to us following a bench trial on the merits, we no longer concern ourselves with the vagaries of the *prima facie* case because subsequent to a trial in a Title VII action, the ultimate issue is one of discrimination *vel non. See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). In such a posture, the *McDonnel Douglas* paradigm of presumption created by establishing a *prima facie* case "drops from the case," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207, and "the factual inquiry proceeds to a new level of specificity," *id.* at 255, 101 S.Ct. at 1095. This new level of specificity "refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). This factual inquiry—the ultimate issue in a Title VII suit—is whether "the defendant intentionally discriminated against the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. In resolving this inquiry, "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination" rests with Jiminez. *See id.* at 256, 101 S.Ct. at 1095.

■ In *St. Mary's,* the Court elaborated on the term "pretext" contemplated by *Burdine* by explaining that the term refers to " 'pretext for discrimination,' " not whether the defendant's articulated reason for its challenged action is false, thereby rejecting the plaintiff's contention that he prevails on the ultimate issue merely by demonstrating that the defendant's proffered explanation for the adverse action is not true. *St. Mary's,* — U.S. at —, 113 S.Ct. at 2752. Proceeding to join issue and narrow the inquiry at this point in the paradigm, the inquiry is further honed so that to establish that a proffered reason for the challenged action

was pretext for discrimination, the plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason" for the challenged conduct. *Id.* After elucidating how the issue of discrimination is sequentially narrowed, the *St. Mary's* Court examined the credence of the defendant's proffered explanation for its challenged conduct. With respect to the language in *Burdine* that the plaintiff may demonstrate discrimination " 'indirectly by showing that the employer's proffered explanation is unworthy of credence,' " *id.* (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1095), *St. Mary's* deduced that this language is contradictory *dictum* that does not comport with *Burdine*'s proof scheme, nor with that of its progeny, *id.* —— U.S. at —— -- ——, 113 S.Ct. at 2752–53. Being contradictory *dictum,* the *St. Mary's* Court concluded that this language "must be regarded as an inadvertence, to the extent that it describes disproof of the defendant's reason as a totally independent, rather than an auxiliary, means of proving unlawful intent." *Id.* at ——, 113 S.Ct. at 2753. Distilling these principles, under *St. Mary's,* the fact-finder's rejection of the legitimate, non-discriminatory reason proffered by the defendant, coupled with the elements of the *prima facie* case, may permit the fact-finder to infer the ultimate fact of invidious discrimination with no additional proof of discrimination; however, the plaintiff is not automatically entitled to judgment because the fact-finder may determine that the defendant's challenged conduct is pretextual, but does not constitute invidious discrimination. Accordingly, rejection of the defendant's proffered reason—standing alone—does not *compel* the ultimate conclusion that the defendant unlawfully discriminated against the plaintiff, thus creating liability under Title VII, but rather this factor may enter the calculus for determining this conclusion. With respect to proving whether the plaintiff has been the victim of invidious discrimination under the *McDonnell Douglas* paradigm, we have opined that if:

> the employee was hired and fired by the same person within a relatively short time span ... this fact creates a strong inference that the employer's stated reason for acting against the employee is not pretex-

tual. . . . In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.

*Proud v. Stone,* 945 F.2d 796, 798 (4th Cir. 1991). Here, the district court misapplied *St. Mary's* because it held that Jiminez proved his ultimate burden of demonstrating that he was the victim of invidious discrimination because he proved that MWC's proffered reason for issuing the terminal contract was unworthy of credence and a pretext for discrimination. Although the district court misapplied the proper legal standard, our examination of the record compels us to conclude that Jiminez failed to satisfy his ultimate burden of proving he was the victim of invidious discrimination.

2.

■ MWC challenges the district court's conclusion that it issued a terminal contract to Jiminez because of invidious discrimination based on race and national origin, a conclusion grounded in facts. Resolution of this challenge entails an examination of the manner in which facts were adduced by the district court. According to MWC, the district court's factual findings are clearly erroneous. In reviewing factual findings, our scope of review is particularly circumscribed, being limited to determining whether the facts as found by the district court are clearly erroneous. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); Fed. R.Civ.P. 52(a). Admonishing appellate courts that a purpose of an appeal is not to exercise plenary review of factual findings or substitute their version of the facts for that of the district court, *see Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), the Court has explained that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently," *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511. Facts are conclusive on appeal, therefore, unless

they are plainly wrong. Being removed in time and place from the trial, not enjoying the advantage of live testimony, or assessing the deportment and credibility of witnesses, reviewing courts tread gingerly in reviewing facts. Jiminez, therefore, is well-armed with the sword and buckler of Rule 52(a) in defending the district court's judgment to the extent MWC challenges the factual findings.

 Our reservation, however, does not compel the conclusion that factual findings are so sacrosanct as to evade review. *See, e.g., Wileman v. Frank,* 979 F.2d 30 (4th Cir.1992) (concluding that factual findings by the district court in a Title VII suit were clearly erroneous and accordingly reversing); *Lilly v. Harris–Teeter Supermarket,* 842 F.2d 1496 (4th Cir.1988) (same); *Miller v. Mercy Hosp., Inc.,* 720 F.2d 356 (4th Cir. 1983) (same), *cert. denied,* 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985). As the *Anderson* Court explained, the district court may not "insulate his findings from review" by casting them as being grounded on credibility determinations. *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512. We reverse a factual finding as being clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). In concluding that the district court has made a mistake, we tend to focus on four avenues in which the district court may go awry in arriving at its factual findings: (1) the district court labored under an improper view or misconception of the appropriate legal standard; (2) the district court's factual determinations are not supported by substantial evidence; (3) the district court disregarded substantial evidence that would militate a conclusion contrary to that reached; and (4) the district court's conclusion is contrary to the clear weight of the evidence considered in light of the entire record. *See Miller,* 720 F.2d at 361. The result of this

focus is to channel our review "upon factfinding processes rather than directly upon factfinding results," *id.,* which, of course, comports with the *Zenith Radio Corp.-Anderson* admonition that an appeal not transform into a plenary trial by which facts are adduced in the first instance. Accordingly, MWC may assault the citadel provided by Rule 52(a) by demonstrating pitfalls in the avenue by which the district court arrived at its factual findings. While *Miller* categorized the various modes in which a district court may clearly err in adducing facts, we do not intimate that these are the only modes that may give rise to clear error. These observations being made, we proceed to analyze the district court's factual findings, focusing on the issue of whether Jiminez proved that the reason for his receipt of a terminal contract was a pretext for invidious discrimination and was the genuine reason for MWC's decision to issue a one-year terminal contract.

## III.

MWC issued Jiminez a terminal contract based on three reasons: (1) consistently poor student evaluations; (2) failure to obtain his Ph.D. in a timely manner; and (3) failure to produce scholarly work.[1] We address these reasons and the facts on which they are premised *seriatim.*

## A.

We first examine the district court's conclusions regarding the student evaluations. First, the district court disregarded all save the last three semesters of Jiminez' student evaluations, concluding that the first five semesters' evaluations were tainted. Second, the district court found that MWC knew of this taint.

### 1.

The district court concluded that the more favorable student evaluations Jiminez received during his sixth, seventh, and eighth

---

1. At oral argument, MWC represented that even disregarding the student evaluations, Jiminez would not have been granted tenure because: (1) he had no departmental support; (2) he failed to obtain his Ph.D.; (3) he had a negative self-

evaluation by the economics department; and (4) he failed to cover course material. We find that the latter three reasons are subsumed by the remaining two reasons cited in the text of the opinion.

semesters at MWC constituted proof that his student evaluations for the first five semesters were tainted by the collusive effort of some white students. According to the district court, the student evaluations for the sixth, seventh, and eighth semesters are exclusively accurate because various white students who had given Jiminez poor evaluations realized by spring of 1992 that their collusion in evaluating Jiminez would not be tolerated. The district court, therefore, disregarded completely student evaluations for the first five semesters Jiminez was at MWC, *i.e.*, all of the evaluations reflecting that Jiminez was a dismal instructor. We conclude that the first five semesters' student evaluations were neither tainted, nor should they have been disregarded.

The record does not support the district court's conclusion that the first five semesters' student evaluations were tainted. One, the "evidence" that the poor student evaluations were tainted by a "conspiracy"[2] motivated by invidious discrimination consists of the letters and testimony from some students stating that there was a collaborative effort against Jiminez by some white students to have him removed from tenure-track status. These letters and testimony are nothing but rank speculation and are far too insubstantial to give rise to the inference that for five semesters Jiminez incurred poor student evaluations because of collusive discrimination based on an unlawful animus by some white students. This "evidence" proves nothing, but merely alludes to the assertion that some, unnamed white students gave Jiminez poor evaluations. Two, many of these letters are undated and unsigned, speak in the vaguest of generalities, and are nothing more than *post hoc* rationalizations for what their authors desire them to be.

■ Moreover, an examination of these letters and testimony does not support a finding of invidious discrimination. For instance, Thomas' letter reported that the statement "Hire a professor who speaks English" was "the truest form of discrimination." (J.A. at 481). We find this bald assertion absurd—requiring that a professor speak the native tongue in order to convey his ideas is not any form of discrimination, invidious or otherwise. This sentence merely expresses the frustration of a student stymied by a professor not conversant in the language of his students. This explanation comports with Kasley's testimony that Jiminez himself recognized that he was difficult to understand. We agree with the First Circuit that "references to audience difficulty in understanding [a Title VII professor seeking tenure] may reasonably be interpreted as expressing a concern about his ability to communicate to students rather than discriminatory animus based on ethnicity or accent." *Bina*, 39 F.3d at 26. Likewise, Holland's letter suggested that because some white students wanted to give Jiminez inferior evaluations, this was motivated by invidious discrimination, but there is nothing unlawfully discriminatory about this ascription of conduct. The letter and testimony by Kasley stating that there was a collective effort to give Jiminez poor evaluations did not attribute any alleged conspiracy to any form of invidious discrimination. Rather, Kasley attributed the poor student evaluations to students who "*did not take the time required . . . to fully understand the material.*" (J.A. at 472) (emphasis added). Further bolstering this conclusion, Kasley testified that "*I am not sure why many of the students in . . . economics class gave Mr. Jiminez poor evaluations, . . . .*" *Id.* (emphasis added). Ultimately, Kasley opined that

---

**2.** The district court found that there was an atmosphere of racial tension at MWC. This finding was based largely on the fact that in the 1991–92 academic year, three black students received an anonymous death threat, but there was no evidence that these threats were from persons at the college, and in 1986–87, MWC commissioned a report on affirmative action, which recommended that "sensitivity training" be implemented at MWC, which action was taken prior to Jiminez' joining the faculty. The "sensitivity training" was implemented primarily because

another black faculty member had received negative evaluations allegedly because of her race. While there may have been some racial tension at MWC, there was not a pervasive atmosphere of discrimination against blacks. For example, President Anderson raised the black student population from three to twelve percent; Jiminez was hired because he was black; MWC sponsored a forum about the death threat; and MWC, which was overwhelmingly white, subjected itself to "sensitivity training."

some students did not do well because they did not work hard enough. Harmonizing with this testimony, former part-time student Kathryn Meyers stated that students critical of Jiminez were likely "those that either talk to their friends throughout class or those who simply choose not to attend the majority of classes." *Id.* at 468. Bielak's letter is equally unavailing because it "wonder[ed]" whether there "might" have been prejudice against Jiminez, but it ascribed any possible prejudice to no invidious motive. *Id.* at 482. Apart from being mere speculation, these observations do not demonstrate a conspiracy or collusive effort against Jiminez based on any form of invidious discrimination. Similarly, Brown's testimony does not establish a conspiracy motivated by an improper racial animus. According to Brown, Jiminez could not control his class, and this lack of control led to "utter chaos." As with the other evidence of the "conspiracy," Brown's testimony reveals no invidious discrimination, but at most that Jiminez lacked the capacity to exert control. These students fail to perceive that the majority of other students may have—and apparently did—find Jiminez to be an abominable instructor. Succinctly put, this evidence is too insubstantial to establish a "conspiracy" to remove Jiminez from tenure-track status, the impetus of which was invidious discrimination. Rather, one guiding force behind Jiminez' being issued a terminal contract was that he was considered an unsuitable instructor by MWC students as reflected in five semesters of execrable student evaluations. In subscribing to this "conspiracy" theory, the district court clearly erred.

The compelled conclusion, therefore, is that the district court erred in finding the first five semesters' student evaluations were tainted, and thus properly disregarded, because there was not substantial evidence to support the finding that for five semesters the student evaluations were tainted. The record conclusively establishes that this evidence was grossly insubstantial to permit the conclusion that there was a conspiracy to effect Jiminez' employment status based on invidious discrimination. Moreover, the record does not establish that *all* five semesters' worth of student evaluations should be disre-

garded. Even though the district court found that all five semesters' student evaluations were tainted, it made no specific findings with respect to each semester, but merely engaged in a wholesale dismissal of all evaluations for Jiminez' first five semesters at MWC. We are disturbed by this dismissal because many of the letters recounting the collusive effort are undated, and the letters that are dated were from April, May, and December of 1992, and do not list specific dates, other than 1991, that the alleged collaboration occurred. *See Bina,* 39 F.3d at 26. Having concluded that there was insubstantial evidence to support a conspiracy theory based on tainted student evaluations, the district court erred in failing to consider the student evaluations for the first five semesters of Jiminez' career at MWC because, as the Eighth Circuit succinctly explained, "student reaction is a legitimate, nondiscriminatory factor on which to evaluate tenure candidates." *Brousard–Norcross,* 935 F.2d at 976; *see also Fields,* 966 F.2d at 53–54 (using student evaluations in reviewing denial-of-tenure decision). The student evaluations that were disregarded disclosed that Jiminez was an inferior instructor, disorganized, confused, experienced difficulty in explaining concepts and answering questions, and these student evaluations coincided with the three evaluations conducted by MWC. Additionally, the district court appeared to conclude that MWC issued Jiminez a terminal contract based only on the fact that it gave credence to the Five Students who complained to Rycroft, but Jiminez' being issued a terminal contract was based on a plethora of information, namely the student and MWC evaluations.

Likewise, the district court disregarded conflicting testimony. For instance, MWC elicited the testimony of Chip Walker, a former student of Jiminez', who stated that Jiminez was ineffective and generally a poor professor. In excluding such testimony from its calculus in determining whether Jiminez was the victim of invidious discrimination, the district court clearly erred. *See Wileman,* 979 F.2d at 35 n. 6; *Hayes v. Invesco, Inc.,* 907 F.2d 853, 858 (8th Cir.1990) (reversing the district court's factual finding with re-

spect to pretext in a discrimination suit because the district court "failed to consider ... important evidence").

In crediting only the latter three semesters' evaluations, the district court did not consider the fact that during this time Jiminez awarded higher grades or that his class size was substantially smaller than average. The district court disregarded this evidence because it "was not considered or even available at the time the terminal contract decision was made." (J.A. at 548–49). This finding, however, is erroneous for at least two reasons: One, Hall knew of the poor student evaluations; indeed, in his May 22, 1992 letter informing Jiminez that he was being given a terminal contract, Hall mentioned the five semesters of negative student evaluations, and Hall was privy to the three MWC evaluations of Jiminez. Two, this view of the evaluations demonstrates MWC's position that Jiminez was an ineffective professor and his latter evaluations were artificially inflated because of the higher grades he awarded and his shrinking class size, as demonstrated by the May 22, 1992 letter, which observed the "unusual and dramatic 'turn-around' " in Jiminez' student evaluations. (J.A. at 523). Thus, the district court made a factual finding "without properly taking into account substantial evidence to the contrary" in reaching its decision. *See Miller,* 720 F.2d at 361 (factual findings of the district court in a Title VII action reversed as clearly erroneous because they were not supported by substantial evidence or were made without considering substantial contrary evidence).

■ Also, the district court found that only these latter evaluations were accurate because white students "realized that such collusion would not be tolerated." (J.A. at 546). There is, however, no evidence that this intolerance was conveyed or published so that white students were supposedly apprised of it. Indeed, Brown stated that the allegedly collusive student evaluations were made subsequent to the decision to issue Jiminez a one-year terminal contract. We are, therefore, "left with a definite and firm conviction that a mistake has been committed" because the district court's findings with respect to the first five semesters' student evaluations were neither supported by the record, nor was contrary substantial evidence considered in adducing the facts.

### 2.

■ We now turn our attention to the district court's finding that MWC knew the student evaluations were tainted, yet failed to take any corrective measures. While the district court found that Hall "accepted as true" what the Six Students told him respecting Jiminez' evaluations, *id.* at 544, this characterization of Hall's testimony is clearly erroneous: Hall did *not* testify that the poor student evaluations were tainted by discrimination, but merely that the Six Students "wanted to remind me that there was a *possibility* that the students had done this because of his race and his national origin, *although the behavior they described said nothing about race—there wasn't anything in the behavior itself that was racial." Id.* at 335 (emphasis added). We are persuaded, therefore, that the testimony does not support the finding that Hall improperly relied on tainted information in deciding to issue Jiminez a terminal contract. *See Miller,* 720 F.2d at 364–68 (reversing a judgment in favor of a Title VII plaintiff based, *inter alia,* on the district court's misunderstanding testimony); *see also Briney v. Sears, Roebuck & Co.,* 782 F.2d 585, 588–89 (6th Cir.1986) (reversing judgment as a matter of law on a negligent design claim because the district court misconstrued testimony). Most revealingly, there is no evidence that any alleged "conspiracy" influenced MWC's decision to terminate Jiminez. There is, therefore, no nexus between the challenged conduct and the adverse action. *See Clay Printing Co.,* 955 F.2d at 942–43. Contrary to the district court's factual finding, therefore, MWC did not knowingly, improperly use tainted evaluations in reaching its decision to issue Jiminez a terminal contract.

### B.

With respect to Jiminez' failure to obtain his Ph.D. and produce scholarly work, the district court gave short shrift to these reasons, merely reciting that they were "pretextual as well" in light of Greenlaw's career at

MWC. Accordingly, the district court ruled that Jiminez carried his ultimate burden of demonstrating that he was the victim of intentional, invidious race and national origin discrimination "because he has proven *both* that [MWC's] 'proffered explanation is unworthy of credence,' and that the reasons given were merely a pretext for discrimination." (J.A. at 552). As stated, we conclude that the district court incorrectly applied *St. Mary's*. We conclude further that the factual premise upon which these legal conclusions were rendered is clearly erroneous.

Jiminez failed to obtain his Ph.D. by August 16, 1989, and the August 3, 1989 letter informing Jiminez of the offer by MWC expressly conditioned his employment success at MWC on his obtaining a Ph.D. This failure rendered Jiminez unqualified because tenure-track professors were required to obtain a terminal degree. While Jiminez submitted a letter from the University of New Mexico dated August 21, 1992, stating that he had successfully defended his dissertation, the letter also explained that Jiminez was "making final editorial changes for the submission of the complete dissertation." *Id.* at 459. At oral argument, the parties represented that Jiminez had failed to obtain his Ph.D. by the date of trial and failed to answer our repeated inquiries as to whether Jiminez had yet been awarded his Ph.D. We, therefore, cannot determine whether Jiminez achieved his terminal degree. Regardless of when, if ever, he obtained his Ph.D., he failed to do so within the prescribed time, and his employment was conditioned expressly on his receiving his Ph.D. by August 16, 1989.

 The district court, however, concluded that Jiminez' failure to obtain his Ph.D. was mere pretext for discrimination because Greenlaw was at MWC for four years before obtaining a Ph.D., yet was not terminated. This finding is flawed because when Greenlaw was hired in 1982, having a Ph.D. was *not* a requirement for promotion, whereas when Jiminez was hired, it was. Comparing Jiminez with Greenlaw is thus not only inapt, *see Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117

L.Ed.2d 124 (1992), but also disregards the predicate and procedure under which each was hired, *see Parson v. Kaiser Aluminum & Chem. Corp.*, 575 F.2d 1374, 1384 (5th Cir.1978), *cert. denied*, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). The district court erred, therefore, in comparing the timing and conditions of Greenlaw's hire with that of Jiminez'. Unlike the district court, we cannot "infer discrimination from a comparison among candidates" for a professorial appointment because "[a] university's prerogative 'to determine for itself on academic grounds who may teach' is an important part of our long tradition of academic freedom." *Lieberman*, 630 F.2d at 67 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). A defendant's requirements with respect to a Title VII plaintiff's academic degree does not constitute invidious discrimination. *See, e.g., Wileman*, 979 F.2d at 37 (holding that an employer's preferring an applicant who obtained a masters degree, as opposed to Title VII plaintiff "who had thirty-seven credits in business administration classes taken over a ten[-]year period" was not evidence of pretext for discrimination and the district court erred in finding otherwise); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987) (explaining that in a Title VII suit an employer may prefer, but not require, that an applicant have a particular degree and such a requirement is not improper); *Hernandez–Cruz v. Fordham Univ.*, 521 F.Supp. 1059, 1071 (S.D.N.Y.1981) (holding that an unsuccessful tenure applicant asserting a Title VII claim based on race and national origin was not awarded tenure for failure to secure a Ph.D., not because of invidious discrimination motivated by improper animus) (Lombard, Circuit Judge). Parenthetically, we observe that, unlike Jiminez, Greenlaw had consistently superior student evaluations, as well as the support of the Economics Department. The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). To this end, the district court erred in concluding

that despite the fact Jiminez was not the best qualified candidate, on hiring him MWC assumed particular or additional burdens "to protect Jiminez from racial and national origin animus." (J.A. at 549). MWC's duty was only to refrain from taking adverse employment action against him because of invidious racial discrimination, and MWC's obligation did not extend to protecting Jiminez against any alleged racial and national origin animus by others in the employment community, nor to excusing derelictions in job performance because the animus of others may have contributed to it.

The district court's conclusion is erroneous because it failed to consider other substantial, contrary evidence. For instance, Cynthia Grund, a white professor hired in 1990, was terminated after one year exclusively because she failed to complete her Ph.D. Additionally, Rick Hydell, a former faculty member at MWC who is white, was given a terminal contract in the same year Jiminez was hired and MWC implies in its brief (although the record is unclear) that his termination was for failure to obtain his doctorate degree, even though Hydell's student evaluations were superior to those of Jiminez. Clear error was the result of disregarding this evidence. *See Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 999 (7th Cir.1983) (stating that the district court committed clear error in disregarding evidence of discrimination in a Title VII suit, but that the error in that instance was harmless). Equally, the district court disregarded the fact that other black professors prospered at MWC. Taddessa Adera, a native Ethiopian, enjoyed superior student evaluations, and he passed his third-year review at MWC. Likewise, Professor George King, who was also black and Chairman of the Physics Department, received stellar student evaluations. These crucial facts were not considered by the district court in rendering its judgment and hence did not enter the calculus in resolving this case. The district court was not at liberty to disregard this evidence. *See Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 538 (3d Cir.1992) (stating that "when the evidence sheds light on whether the employer treated similarly situated males and females alike, it should not be ignored"), *cert.*

*denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

## C.

Jiminez produced no scholarly work. While he was somewhat excused from this requirement while working on his Ph.D., he did not complete his Ph.D. in the prescribed time, nor by the time he was given a terminal contract; hence, he cannot take refuge in this safe harbor. Jiminez himself testified that during his entire stint at the college, he never published a single work in a peer-review publication. We note that Jiminez' failure to produce scholarly publications presents a legitimate rationale for issuing a terminal contract. *See King v. Board of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 540 (7th Cir.1990) (explaining that a Title VII plaintiff "was not qualified for tenure renewal," *inter alia,* because she failed to produce "scholarly publications"); *Lieberman,* 630 F.2d at 66 (noting that scholarship is an integral factor in assessing tenure-type decisions). As with the other evidence, the district court disregarded the fact that Jiminez had defaulted on this obligation and, in so doing, clearly erred.

## IV.

We are left with the definite conviction that the factual findings of the district court are clearly erroneous. Predicated on such a faulty premise, the district court's legal conclusions cannot withstand scrutiny. Here, the district court ignored substantial evidence or failed to evaluate substantial contrary evidence in making its findings of fact. We hold that Jiminez failed to satisfy the obligations imposed on him by *St. Mary's* in that he failed to prove that he was a victim of invidious discrimination. The judgment of the district court, therefore, is reversed.

*REVERSED.*