**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1623

JAMES RAY,

Plaintiff - Appellant,

versus

CSX TRANSPORTATION, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  James C. Turk, Senior District Judge.  (CA-04-134-7)

Argued: March 16, 2006                     Decided: May 23, 2006

Before WILKINSON and SHEDD, Circuit Judges, and Cameron McGowan CURRIE, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Devon James Munro, LICHTENSTEIN, FISHWICK & JOHNSON, P.L.C., Roanoke, Virginia, for Appellant.  Robert Craig Wood, MCGUIREWOODS, L.L.P., Charlottesville, Virginia, for Appellee.  **ON BRIEF:** John P. Fishwick, Jr., LICHTENSTEIN, FISHWICK & JOHNSON, P.L.C., Roanoke, Virginia, for Appellant.  Aaron J. Longo, MCGUIREWOODS, L.L.P., Charlottesville, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

James Ray, an African-American employee of CSX Transportation, Inc., brought this Title VII action against CSX for race discrimination. See 42 U.S.C. §§ 2000(e) et seq. Ray alleged that CSX discriminated by enforcing disciplinary measures against him differently than against white employees. The jury found in Ray's favor and awarded him $72,000 in compensatory damages and $128,000 in back pay. On CSX's post-trial motion, the district court granted judgment as a matter of law to CSX; alternatively, the district court sua sponte granted a conditional new trial. See Fed. R. Civ. P. 50, 59. Ray now appeals these rulings. For the following reasons, we affirm the district court's grant of judgment as a matter of law in favor of CSX.

I.

On March 31, 2003, CSX transferred Ray -- a longtime CSX employee -- to its Balcony Falls work site in Glasgow, Virginia.[1] At Balcony Falls, Ray worked as a conductor on CSX's two-man train crews, which consisted of a conductor and an engineer. Upon the completion of the work day, the conductor was responsible for

---

[1]In this appeal from a ruling on CSX's Rule 50 motion, we view the facts in the light most favorable to Ray, the nonmovant. Babcock v. BellSouth Adver. and Publ'g Corp., 348 F.3d 73, 75 n.1 (4th Cir. 2003).

2

logging the train crew out at a designated CSX computer terminal at Balcony Falls.

After Ray had been at Balcony Falls for 17 days, CSX became suspicious that several Balcony Falls employees (including Ray) had been wrongfully claiming ("stealing") overtime. Specifically, CSX suspected that some of its train crews were stealing overtime by logging-out at home instead of logging-out at the designated computer terminal. CSX's suspicion first arose because of information learned by Steve Persinger, a white CSX trainmaster, about the payment of overtime to William Hardbarger, a white CSX engineer. Persinger relayed this information to Wes Knick, CSX's terminal manager, and Don Hensley, CSX's district superintendent. Hensley asked Persinger to investigate.[2]

As part of this investigation, Knick visited Balcony Falls. On the day of his visit, Knick observed the train crew finish its work for the day, but contrary to CSX's policy, the crew did not log-out from the designated terminal. Thus, Knick made visual confirmation of a CSX overtime policy violation. The offending

_____

[2]Lenford Hatcher, an African-American CSX trainmaster, was the same rank as Persinger and was the direct supervisor of Ray's territorial jurisdiction. Hatcher was not at work on the day the investigation began. When Hatcher later asked for information on the investigation, he was told that CSX had it under control. Testimony established that CSX's ordinary practice was that a manager who began an investigation maintained control of it until its conclusion.

3

crew that day was composed of Ray and T.S. Mahaffey, a white CSX engineer.

Meanwhile, Persinger was continuing the investigation from his office. Using his computer, Persinger accessed the log-in/log-out times for all Balcony Falls employees for the preceding several weeks. Because some employees had logged-out from terminals that Persinger did not recognize, he sent an e-mail cataloguing log-out information from March 31 through April 17, 2003, to CSX's Information Security Office ("Infosec"), in Jacksonville, Florida, asking how to identify the locations of those unrecognized terminals. Infosec explained in response that certain Union officials employed by CSX had access to a computer program called the "Blue Zone."[3] Although CSX had a zero tolerance policy for employees logging-out from remote locations, Blue Zone had the unintended effect of allowing employees with the software and an internet connection to log-out from a remote location, usually the employee's home. Logging out from such remote locations allowed employees to steal overtime by receiving credit for time they were actually not working. The terminals that Persinger did not recognize were remote locations where employees had used Blue Zone to log-off. Because each entry for log-out times displayed an

---

[3]Ray was not a Union official and did not have authorization to possess the Blue Zone software.

4

employee identification number, Persinger could identify which employees had improperly logged-out using Blue Zone.

Given this explanation, Persinger suspected that several employees had stolen overtime. In an effort to confirm his suspicion, Persinger obtained the "engine download" information from the train's "black box," which records the time when the train engine was operating. Because Persinger believed that it usually took a crew no more than one hour after a train's engine shut down to complete necessary paperwork and log-out, he was able to estimate from the black box data the approximate time that the train crews should have logged-out on each day. Persinger discovered, however, that the engine download information was available only from April 11 through April 17, 2003.[4]

At some point during the investigation, Persinger called Hardbarger to inquire about what time he and Ray had finished work on a day that Ray had logged-out using Blue Zone. The next day, Hardbarger confessed to Persinger that he had also used Blue Zone on one occasion to log-out. Hardbarger's use of Blue Zone was on April 5, 2003. Hardbarger maintained throughout the investigation

---

[4]The black box had a limited amount of recording tape and continuously recorded over previously recorded data. If the train was used daily, the tape stored approximately six days of information before it recorded over previous recordings.

and subsequent disciplinary proceedings that in using Blue Zone he had not intended to steal overtime.[5]

After conducting this investigation, Persinger spoke with Hensley and John Thompson, CSX's director of labor relations, and informed them of the information he had compiled. Thompson then instructed Persinger to bring charges against Ray and three white employees (Hardbarger, Mahaffey, and Larry Woodward) for overtime violations. Ray was charged for four violations in which he had improperly logged-out. These violations occurred on or after April 11, 2003. Two of these violations involved Hardbarger, one involved Mahaffey, and one involved Woodward. These men were charged as crew members. There is no dispute that Ray committed these violations. Additionally, Ray and Hardbarger were charged for the separate April 5 incident to which Hardbarger had confessed. Hardbarger had logged-out on that day, and Ray was a crew member.

Although it was evident from Persinger's e-mail to Infosec that both Ray and Woodward had improperly logged-out using Blue Zone on several occasions prior to April 11, CSX did not charge either for those violations. Persinger explained that he did not charge for those earlier violations because he had no corroborating evidence. Although the black box data only revealed when the train

---

[5]As a union official, Hardbarger was entitled to have Blue Zone.

stopped, not when the employee actually left work, Persinger believed that the data provided a sufficient form of corroboration to charge an employee with a violation of company policy.

Pursuant to a Collective Bargaining Agreement ("CBA") between CSX and the Union which represented CSX's employees, CSX conducted a Board of Inquiry for each charged violation. At each Board of Inquiry involving a charge that Ray had improperly used Blue Zone to log-out, Ray took full responsibility for the violation and exonerated the other employees with whom he was charged. Specifically, Ray admitted that he was the one improperly using Blue Zone and that the other members of his train crew were ignorant of, and had nothing to do with, his use of Blue Zone. Additionally, Ray refused to divulge how he obtained the Blue Zone software.

Following these Boards of Inquiry, Garhart Williams, the head of the CSX Huntington Division, reviewed the Boards' proceedings and discussed them with Thompson. Williams then recommended to Doug Greer, CSX's regional vice-president, that Ray be terminated based on his admitted multiple Blue Zone violations. Williams also recommended a 15-day suspension for Woodward and no punishment for Mahaffey based on their relatively minor role in the offenses, and he recommended a 60-day suspension for Hardbarger, who had confessed and attributed his use of Blue Zone to a mistake. CSX

7

accepted Williams' recommendation and disciplined the employees accordingly.[6]

Pursuant to the CBA, Ray appealed his termination to an arbitrator. As a result of an arbitration award, Ray was reinstated without back pay. Although the arbitrator reinstated Ray, he found that there was "not a scintilla of credible proof [of] any form of racial discrimination." J.A. 599.

## II.

At trial, Ray bore the burden of proving "that he has been the victim of intentional discrimination." Jiminez v. Mary Washington Coll., 57 F.3d 369, 377 (4th Cir. 1995) (internal punctuation omitted). After the verdict for Ray, the district court granted judgment as a matter of law in favor of CSX under Rule 50(b), which provides that a district court may grant such a motion if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Specifically, the district court held that the facts of this case support only one conclusion: CSX was not motivated by discrimination in charging or terminating Ray for his overtime violations.

Ray contends that the district court erred in granting this Rule 50 motion. We review this ruling de novo. Bryant v. Aiken

---

[6]According to Williams, he told Greer that he intended to implement his recommendations unless he was instructed otherwise.

<u>Reg'l Med. Ctrs., Inc.</u>, 333 F.3d 536, 543 (4th Cir. 2003). Under Rule 50(b), our inquiry is whether a jury, viewing the evidence in the light most favorable to Ray, "could have properly reached the conclusion reached by this jury." <u>Id.</u> (internal punctuation omitted). If reasonable minds could differ about the result in this case, we must reverse the grant of judgment as a matter of law. <u>Id.</u> In reviewing the district court's judgment, "we examine the full trial record to determine whether sufficient evidence supported the jury's verdict." <u>Id.</u> (internal punctuation omitted).

## A.

Ray first contends that he was treated differently than white CSX employees who were not charged with overtime violations. The district court recognized that CSX presented evidence that it would not charge employees without black box data or other corroboration, and stated that Ray's "subjective beliefs that the charges were limited based on the engine download information in order to target him does not render [CSX's] explanations unworthy of belief." J.A. 591. Like the district court, we conclude that Ray has presented insufficient evidence that he was discriminated against when CSX brought charges against him.

Initially, we point out that the other three employees charged along with Ray were white. This fact militates against a conclusion that CSX discriminated against Ray. <u>See</u> <u>Hicks v.</u>

9

<u>Southern Md. Health Sys. Agency</u>, 737 F.2d 399, 403 (4th Cir. 1984).

Further, CSX maintained that it would only charge an employee with a violation for stealing overtime if there was corroborating evidence, such as black box data or the employee's own confession, and the facts establish that CSX did not charge any overtime violations against either white or African-American employees where there was no corroborating evidence. Indeed, CSX did not charge Ray for two prior instances when he stole overtime because there was no corroborating evidence.

Ray contends that the black box data does not corroborate an overtime violation and was therefore unnecessary to bring charges. Although Ray points to evidence that in hindsight suggests that the black box data did not provide any corroboration for these offenses, he presented no evidence to establish that Persinger's belief that the black box data offered corroboration was anything but honest. Thus, whether the black box data was actually necessary or not is immaterial because "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" Persinger's decision. <u>DeJarnette v. Corning Inc.</u>, 133 F.3d 293, 299 (4th Cir. 1998).[7]

_____

[7]Although Ray points to additional evidence to support his claim that CSX unfairly charged him, we find that evidence to be insufficient to establish that CSX discriminated against him.

Because CSX only charged those employees for violations where it believed corroborating evidence existed, and it charged white and African-American employees equally under this standard, "there was no disparity of treatment from which one could conclude that [CSX's decision to charge Ray] was a product of racial discrimination." Cook v. CSX Transp. Co., 988 F.2d 507, 512 (4th Cir. 1993). Accordingly, we find that Ray presented insufficient evidence that he was discriminated against when CSX brought charges against him.

B.

Ray also claims that he was treated differently than white CSX employees who were charged for overtime violations because he received a more severe punishment. The district court rejected this theory, holding that Williams, the decisionmaker, was not motivated by Ray's race but, instead, based his decision on Ray's admitted multiple overtime violations. Like the district court, we conclude that Ray failed to establish that CSX discriminated against him in this regard.

Although Ray argues that Persinger was the relevant decisionmaker and that Williams had a limited role in handing down a foregone sentence, even if we assume Persinger was biased, we decline to deem "a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal

11

employment decision . . . a decisionmaker simply because he had a substantial influence on the ultimate decision" or because he played a significant role in the adverse employment decision.  <u>Hill v. Lockheed Martin Logistics Mgmt.</u>, 354 F.3d 277, 291 (4th Cir. 2004) (<u>en banc</u>).  Given the facts of this case, we find that at this stage in the disciplinary proceedings Williams made the relevant decision himself.  Further, we find that based on Ray's confessions -- which completely exonerated his fellow crew members on those instances in which he improperly logged-out -- he was no longer engaged in conduct that "was comparable in seriousness to misconduct of employees outside the protected class."  <u>Cook</u>, 988 F.2d at 511.  Thus, because the coworkers charged along with Ray were not engaged in conduct of comparable seriousness, Ray cannot establish that the discipline enforced against him was a product of racial discrimination.  <u>See</u> <u>id.</u>  For these reasons, CSX did not discriminate against Ray by punishing him more severely than others also charged for overtime violations.[8]

---

[8]Although Hardbarger admitted using Blue Zone to log-out improperly on one occasion, his situation differs from Ray's. Hardbarger had previously confessed to his own violation, and unlike Ray he attributed the violation to a mistake.  Ray has not pointed to any evidence in the record to suggest that CSX had reason to doubt Hardbarger's explanation.

12

III.

In conclusion, we hold that the district court did not err in granting judgment as a matter of law in favor of CSX. The evidence, even viewed in the light most favorable to Ray, established that CSX charged Ray and other employees for overtime violations only when it had what it considered to be corroborating evidence of a violation. In those instances when CSX had such evidence, it charged all white and African-American employees. Likewise, when CSX was aware of an overtime violation but did not have corroborating evidence, it did not charge white or African-American employees (including Ray). Moreover, CSX terminated Ray only because of his own admissions that evinced more culpable conduct than other employees who were charged. Accordingly, we affirm the district court's grant of CSX's motion for judgment as a matter of law.[9]

AFFIRMED

---

[9]Because we affirm the district court's grant of judgment as a matter of law, we need not address Ray's contention that the district court erred in granting a conditional new trial.