PER CURIAM:
Diana R. Williams appeals the United States Department of Labor Administrative Review Board’s Final Decision and Order accepting the Administrative Law Judge’s Recommended Decision and Order to deny her wrongful termination complaint against the Baltimore City Public School System. Mrs. Williams alleges that she was unlawfully terminated due to her involvement in a course of protected activities relating to her complaints and attempts to expose lead and asbestos hazards at several Baltimore City schools. We are of opinion that the review board’s decision dismissing Mrs. Williams’ complaint was supported by substantial evidence, and accordingly, we affirm.
I.
The factual details of this case are extensive, but the relevant facts can be summarized as follows. Mrs. Williams taught mathematics at schools within the Baltimore City Public School System (System). Mrs. Williams spent most of her career at Fairmount-Harford High School (Fair-mount), although in 1997 the school system transferred her to Southeast Middle School (Southeast) because Mrs. Williams believed Fairmount’s building was unsafe after renovation, apparently because of inadequate lead and asbestos removal.
From 1996 to 1998, Mrs. Williams was convinced the System schools contained unsafe levels of lead and asbestos. Mrs. Williams took several steps to effect school safety and community awareness. She became a lead abatement expert so her own testing of school conditions would carry more weight. She filed several complaints with the Maryland Occupational Safety and Health Administration (MOSH), wrote letters to the Mayor of Baltimore, notified television and news organizations, contacted school principals and the Baltimore City Council, distributed fliers at schools and in nearby neighborhoods, videotaped school conditions, and interviewed a pregnant high school student alleging the student’s pregnancy complications resulted from school conditions. She also refused to work for much of the 1996-1997 school year because of her concerns about the conditions at Fairmount. It is not contested that Mrs. Williams’ initial actions were protected activity and triggered MOSH investigations. The administrative law judge and the review board held, however, that after the schools were deemed safe, Mrs. Williams’ continued activities, especially her distribution of two letters and a flier, which impeded the schools’ educational function, was unreasonable and unprotected.
First, shortly before the school year began on September 3, 1997, Mrs. Williams wrote a letter to the Mayor of Baltimore. Mrs. Williams’ letter claimed Fairmount’s staff and students had been exposed to lead and requested analysis of every painted surface of the school buildings and a soil analysis of the school’s play area. Mrs. Williams offered to do the testing and requested the school be shut down while the testing was conducted. Mrs. Williams attempted to distribute copies of the letter *566 at Fairmount but was asked to leave by the principal. Mrs. Williams then went to Southeast, where she placed copies on the cars in Southeast’s parking lot. Mrs. Williams also distributed the letter to cars in a church parking lot, and she mailed a copy to the Baltimore Times, which published the letter. According to the administrative law judge, however, by December 1996, it was unreasonable for Mrs. Williams to allege Fairmount’s conditions were unsafe. By 1996, “testing and cleanup had occurred, a lead abatement contractor and asbestos contractor were engaged on an ongoing basis, and the staff and students had been screened for elevated lead levels. MOSH had investigated the Claimant’s complaints, and found that the building was safe for occupancy.”
Second, in April 1998, Mrs. Williams prepared a flier she distributed alleging James Mosher Elementary School (James Mosher), Highlandtown Middle School (Highlandtown), and Fairmount had been cited for lead-based paint hazards by an expert on lead abatement.[1] Mrs. Williams’ flier told parents their children needed to be tested for lead and asbestos exposures; additionally, Mrs. Williams identified herself as a lead expert and provided her name and phone number on the flier. Mrs. Williams distributed this flier to students and staff at James Mosher and at nearby apartment complexes. James Mosher’s principal, Mrs. Cascelia Spears, testified that her office heard from numerous parents about Mrs. Williams’ flier. Mrs. Williams also complained of lead problems at Highlandtown, but MOSH inspectors had inspected these schools and found no grounds for citation.
Third, by a letter dated February 24, 1999, Mrs. Williams addressed the parents of children at Southeast regarding lead in the drinking water at the school. Mrs. Williams obtained without the school’s permission a list of students’ parents’ names and addresses and sent a letter to each address. Mrs. Williams’ letter warned parents that the school’s drinking water contained unacceptably high amounts of lead. Mrs. Williams also included one of her personal business cards identifying herself as a lead abatement expert. At the time Mrs. Williams sent this letter, the school had turned off all the water fountains and established stations to distribute bottled water pursuant to the City Health Department’s recommendation. School officials stated that due to Mrs. Williams’ letter, Southeast received so many phone calls from concerned parents and the media that the area office was unable to reach them by phone and had to use the telefax for emergencies.
On May 7, 1999, Dr. Robert Booker, the Chief Executive Officer of the System (CEO), recommended to the Baltimore City Board of School Commissioners (School Board) that Mrs. Williams be dismissed for misconduct. Mrs. Williams was placed on emergency suspension without pay, pending further disciplinary action. According to the evidence before the administrative law judge, a teacher needs permission from her principal to have access to the school system’s list of names and addresses, which is privileged information. On August 26, 1999, Mrs. Williams received a dismissal hearing before a hearing examiner of the Baltimore School Board.[2] The hearing examiner found mer *567 it in Mrs. Williams’ allegations and recommended against her dismissal. The School Board rejected the recommendation of the hearing examiner and affirmed the CEO’s decision to dismiss Mrs. Williams for misconduct in office. The federal administrative law judge concluded:
[T]he Board found that the Claimant committed misconduct in office by failing to follow the chain of command when she disseminated information about alleged potential health hazards at three System schools. Additionally, the Board also found that she did not have permission to obtain the home addresses of the approximately 500 students at Southeast, and that this confidential student information was wrongfully acquired to further the Claimant’s personal goals and objectives. The Board concluded that the Claimant violated the Ethics Laws and Codes of Conduct of Baltimore City in attaching her personal business card to this communication. The Board disagreed with the hearing examiner’s conclusions, and found that the Claimant’s repeated failure to follow proper procedure when addressing alleged health and safety concerns had a direct bearing on her fitness to teach, such that it would undermine her future classroom performance and overall impact on students.
The administrative law judge also reviewed evidence which tended to show that Mrs. Williams’ perceptions may have been derived from psychological problems. The administrative law judge noted Mrs. Williams, “acknowledged that her doctor has diagnosed her with depression and stress, and suggested medication. She is angry at the ‘system,’ and suspicious that MOSH has been concealing the facts; she will not take medication, but prefers to rely on her faith.” The administrative law judge also reviewed a report from Dr. Stephen W. Siebert, who conducted a psychiatric evaluation of Mrs. Williams. Siebert concluded some of Mrs. Williams’ allegations “seemed highly implausible” and “might not be reality based.” Siebert noted Mrs. Williams had a “paranoid stance” and believed there was a “coverup involving many people.” Siebert felt Mrs. Williams “rationalized facts to her own beliefs.” Siebert also noted Mrs. Williams dismissed school reports and studies as biased or fraudulent. Siebert did not find that Mrs. Williams suffered from acute stress, posttraumatie stress disorder, or major depression. Siebert instead believed Mrs, Williams “had either a delusional or personality disorder representing a preexisting condition, not causally related to any accidental injury.”
In 1999, Mrs. Williams filed a complaint with the Department of Labor. She alleged she had been wrongfully terminated in retaliation for whistleblowing about environmental hazards in System schools in violation of employee protections set forth in the Safe Drinking Water Act, 42 U.S.C. § 300j — 9 (2000); the Toxic Substances Control Act, 15 U.S.C. § 2622; the Clean Air Act, 42 U.S.C. § 7622 (2000); the Solid Waste Disposal Act, 42 U.S.C. § 6971 (2000); the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9610 (2000); and the Federal Water Pollution Control Act, 33 U.S.C. § 1367 (2000).
*568 On November 30, 2000, the administrative law judge issued a recommended decision and order, finding that Mrs. Williams failed to prove that the System was motivated in whole or in part by any protected activity by Mrs. Williams when it suspended and dismissed her from her position as a mathematics teacher. The administrative law judge found Mrs. Williams’ initial complaints to “various regulatory groups, as well as her public airing of her concerns about the potential safety hazards presented by the renovation project occurring at Fairmount, were clearly protected activity within the meaning of the applicable statutes.” However, the administrative law judge found Mrs. Williams’ actions lost their protected status after her concerns were investigated and the buildings were found safe. The administrative law judge also determined that Mrs. Williams refused to accept these results, and her continued perceptions of the environmental conditions of the System became unreasonable. Additionally, the administrative law judge determined that the allegations regarding school safety that Mrs. Williams made during the last three years of her System employment were motivated by her desire to “use the cloak of whistleblower” to avoid disciplinary action for her attendance problems. Finally, the administrative law judge found Mrs. Williams’ unauthorized letters and fliers provided the System with a legitimate, nondiscriminatory basis for her dismissal.
The report of Administrative Law Judge Chapman is 44 pages in length. It is carefully and dispassionately done. We invite attention to that excellent report.[3]
The plaintiff appealed, and on May 30, 2003, the administrative review board affirmed and, with an inconsequential exception, affirmed both the fact finding and application of precedent of the administrative law judge in its final decision. The review board noted Mrs. Williams’ briefs “barely” addressed the administrative law judge’s conclusions of law and instead quarreled with the administrative law judge’s factual findings by asserting all of her whistleblowing activities were supported by evidence and were valid since, she alleged, the lead and asbestos problems had not been adequately resolved. The review board concluded, “[The Systemj’s proferred reasons for suspending and dismissing Williams — her unauthorized use of the names and addresses of persons to whom she sent the letters and the disruption in the school system caused by circulating the unfounded allegations— were legitimate and nondiscriminatory. According to the ALJ, Williams did not establish that these reasons were a pretext for discrimination.” Mrs. Williams appeals the review board’s final decision and order.
II.
This court reviews the review board’s decision and order to determine whether it is supported by “substantial evidence” and whether it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.” 5 U.S.C. *569 § 706(2)(A)-(E); Blackburn v. Martin, 982 F.2d 125, 128 (4th Cir.1992). “Substantial evidence consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Black-bum, 982 F.2d at 128 (internal quotes and citation omitted).
A.
The employee provisions of each of the Acts under which Mrs. Williams brought claims prohibit an employer from discharging or otherwise discriminating against an employee because the employee engages in activities that are subject to protection under the Act. The Supreme Court set forth the shifting burdens for proving a case of discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed these principles in Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
The plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. Burdine, 450 U.S. at 253-54, 101 S.Ct. 1089. To establish a prima facie case of retaliatory discharge, the employee must prove that (1) the employee engaged in a protected activity; (2) the employer took an adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998).
If the employee establishes a prima facie case, the burden shifts to the employer to provide sufficient evidence that the adverse action was taken for a legitimate, nondiscriminatory reason. Burdine, 450 U.S. at 253, 101 S.Ct. 1089. “The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant’s evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.” Burdine, 450 U.S. at 254, 101 S.Ct. 1089 (citation omitted). If the employer meets this burden, the employee must show by a preponderance of the evidence that the legitimate reasons offered by the employer were actually a pretext for discrimination. Burdine, 450 U.S. at 253, 101 S.Ct. 1089. Although the burden of production shifts, “[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.” Burdine, 450 U.S. at 253,101 S.Ct. 1089.
B.
Mrs. Williams claims that the public expression of her concerns was protected activity and the System fired her, at least in part, for engaging in such activity. The Department of Labor (DOL) does not dispute that Mrs. Williams’ initial whistle-blowing was protected activity, and that the System knew of her protected activity. The DOL agrees that Mrs. Williams’ initial whistleblowing was reasonable and protected. However, the DOL further asserts that, as found by the administrative law judge and the review board, once the school facilities were deemed safe, it was unreasonable for Mrs. Williams to allege they were unsafe. Moreover, the DOL claims that it was unreasonable and unprotected activity for Mrs. Williams to distribute letters and fliers alleging unsafe school conditions, and to do so by making an unauthorized use of school address lists. Finally, DOL contends that in any event, the System had legitimate, nonretaliatory and nondiscriminatory grounds to dismiss Mrs. Williams.
The administrative law judge found, and the review board affirmed, that Mrs. Williams had engaged in many activities that the various Acts protect. However, *570 the administrative law judge found that the System suspended Mrs. Williams because of the February 1999 letter she mailed to parents of students erroneously stating that drinking water in one of the schools contained lead. She had previously circulated similar letters in 1996 and 1997 containing unfounded and sensationalized allegations about lead and asbestos hazards at three other schools. The administrative law judge held that mailing these letters was not protected activity. The administrative law judge also held that even if Mrs. Williams’ activities “were found to be protected activity ... the record clearly establishes that” the System “had a legitimate and nondiscriminatory reason for its actions in suspending ... and then dismissing her.”
We are of opinion that the findings of the administrative law judge and the review board are supported by substantial evidence. Mrs. Williams’ complaints centered around four schools. She first publicly expressed concerns about the potential safety hazards presented by the renovation project at Fairmount. There is no disagreement that these complaints were “clearly protected activity within the meaning of the applicable statutes.” In response, the System “undertook significant activity to ensure that the environment was safe, that any potential problems were corrected, and that a plan was in place to monitor the safety of the occupants during the renovation.” The school was inspected numerous times by MOSH and the City Health Department and no violations were found. Mrs. Williams presented no credible evidence that hazards remained after the project was completed.
In response to Mrs. Williams’ complaints about two other schools, James Mosher and Highlandtown, MOSH inspected each. No environmental hazards or violations were identified. At Southeast, her complaint about the safety of the drinking water was addressed by testing. The testing showed problems at only one fountain, which was supposed to be turned off. Again, steps were taken to ensure that any potential hazards were avoided by turning off all drinking fountains and providing bottled water. Important steps were taken at each school in response to Mrs. Williams’ concerns to ensure the safety of students and staff in each budding. Once her concerns were addressed, however, it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity.
Thus, when she mailed the February 1999 letter to parents of students, it would seem that her allegations were not grounded in a reasonable perception of an environmental hazard. The administrative law judge found that “the mailing of this letter was not protected activity, nor was the distribution of the fliers on the two previous occasions.”
The System took adverse action against Mrs. Williams when it suspended her on March 1, 1999. Mrs. Williams, however, must at least raise an inference that protected activity was the likely reason for the adverse action, which she does not. Causey, 162 F.3d at 803. It is clear that the precipitating cause of action was the February 1999 letter to parents about lead in the water at Southeast, but as the administrative law judge found, this letter was not protected activity. Furthermore, even if this particular letter were protected,[4] the System has established that her *571 suspension was motivated by legitimate and nondiscriminatory reasons. As the administrative law judge noted:
“With respect to the Claimant’s dismissal, the Statement of Charges identifies three activities as the basis for the charge of misconduct: the circulation of the February 24,1999 letter, the circulation of the December 3, 1996 letter to the Mayor about lead exposure at Fair-mount, and the circulation of the letter (in the spring of 1997) about Fairmount, James Mosher, and Highlandtown____ it is limited to that conduct on the part of the Claimant that caused disruption in the school system, by unnecessarily alarming parents and diverting school resources to respond to inquiries, when in fact the System had adequately responded to the concerns raised by the Claimant.”
Indeed, Miss Jane Fields, the principal at Southeast, testified that, even if Mrs. Williams’ allegations had some merit, she still would have recommended her suspension for obtaining unauthorized access to the list of names and addresses of parents. Thus, the System has set forth legitimate, nonretaliatory and nondiscriminatory reasons for Mrs. Williams’ suspension and dismissal and Mrs. Williams has not established that these reasons were a pretext.
III.
We are of opinion from our review of the record that the conclusion of the Secretary of Labor is based upon substantial evidence and is without reversible error. The administrative law judge and the review board did not err in finding that Mrs. Williams’ whistleblowing actions were initially protected, but that once MOSH determined the schools were safe, Mrs. Williams’ distribution of the letters and fliers was unprotected activity, giving the System legitimate grounds to dismiss her. Furthermore, even if the February 1999 letter does constitute protected activity, the administrative law judge did not err in holding that the System set forth legitimate and nondiscriminatory reasons for Mrs. Williams’ dismissal.
Accordingly, the decision of the Secretary of Labor is

AFFIRMED.

. The expert referred to was Mrs. Williams.

. There were two levels of administrative review. The Baltimore School Board caused Mrs. Williams' complaints and the incidents of her discharge to be heard before a hearing examiner, who reviewed the decision of the Chief Executive Officer of the School System to discharge her. That hearing examiner reported favorably for Mrs. Williams, but the School Board did not accept his decision. *567 Mrs. Williams then filed suit under the various statutes such as the Safe Drinking Water Act, 42 U.S.C. § 300j-9(i)(2) to have her discharge reviewed by the Secretary of Labor. An administrative law judge first heard the case and decided against Mrs. Williams, which decision she appealed to the Administrative Review Board. That board affirmed the decision of the administrative law judge. The decision of the review board became the decision of the Secretary of Labor.

. If footnote 7 of the opinion of the Administrative Review Board of the Department of Labor is meant to emphasize that a preponderance of the evidence is not required in proving a prima facie case in a charge of discrimination such as this, it is likely contrary to Burdine, 450 U.S. at 253, 101 S.Ct. 1089. If footnote 7 is meant to emphasize that following a trial on the merits in such cases, the proof of a prima facie case is usually inconsequential as dealing with the “vagaries of the prima facie case,” it is consistent with Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995). In any event, the treatment of the proof of a prima facie case is inconsequential here because neither the ALJ nor the Administrative Review Board based Mrs. Williams’ loss on any failure to prove a prima facie case. The fact finding of the ALJ is supported by substantial evidence.

. Clearly the December 3, 1996 letter and the circulation of the flier in the spring of 1997 did not constitute protected activities since the System had adequately responded to Mrs. *571 Williams' complaints, and investigations of the buildings had deemed them safe prior to each of those two activities.