**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 07-1463**

———————

BENEDICT D. ILOZOR, Ph.D.,

        Plaintiff - Appellant,

    v.

HAMPTON UNIVERSITY,

        Defendant - Appellee

    and

ERIC SHEPPARD; BRADFORD GRANT,

        Defendants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.   Jerome B. Friedman, District Judge.   (4:06-cv-00090-JBF)

———————

Argued:  May 15, 2008            Decided:  July 23, 2008

———————

Before WILLIAMS, Chief Judge, and MICHAEL and MOTZ, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Richard Franklin Hawkins, III, Richmond, Virginia, for Appellant.   David Edward Constine, III, TROUTMAN SANDERS, LLP, Richmond, Virginia, for Appellee.   **ON BRIEF:** Laura D. Windsor, TROUTMAN SANDERS, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Benedict D. Ilozor appeals the district court's grant of summary judgment in favor of Hampton University ("Hampton") on his discriminatory discharge and breach of contract claims. Ilozor, a former professor at Hampton, argues that Hampton failed to renew his teaching contract because of his national origin, in violation of Title VII, 42 U.S.C.A. § 2000e-2(a)(1) (West 2003), and because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-634 (West 1999 & Supp. 2008). Ilozor further contends that Hampton entered into a side-contract with him to reimburse him for his moving expenses, and breached that agreement by failing to pay. For the following reasons, we affirm.[1]

## I.

Because this is an appeal from the district court's grant of summary judgment to Hampton, we review the facts in the light most favorable to Ilozor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

---

[1] Ilozor also contests the district court's denial of his Motion to Strike addenda to Hampton's reply memorandum in support of its summary judgment motion. Because the challenged addenda are not essential for Hampton to prevail, we need not resolve this issue. Accordingly, for purposes of this appeal, we will ignore the contested addenda and consider only the earlier-provided evidence.

Ilozor is a native of Nigeria and a citizen of both Nigeria and Australia. He received bachelor's and master's degrees in the field of architecture from Nigerian institutions and a Ph.D. in architecture from an Australian university. Until the summer of 2003, Ilozor was a tenured faculty member at the School of Architecture and Building at Deakin University in Sydney, Australia. At that time, Hampton, a private, Historically Black College and University located in Hampton, Virginia, selected Ilozor from a pool of twenty applicants for a non-tenure track position in its Department of Architecture.

Specifically, the position for which Ilozor had applied was a temporary annual ("TA") post. Hampton has three different types of faculty--TA, probationary tenure track ("PTT"), and tenured. Unlike tenured professors, faculty with PTT or TA positions have nine-month (academic year) contracts with no guarantee of reappointment. PTT and TA positions differ in that TA positions are non-tenure track, while PTT professors must apply for and be granted tenure within six years, or else leave Hampton.

The Department of Architecture Chair, Bradford Grant, made the decision to hire Ilozor for the TA position. Through Ilozor's application materials, Grant knew of Ilozor's age (then thirty-eight) and national origin. He offered Ilozor the job via e-mail on July 26, 2003. Because Ilozor had raised the issue of his

4

relocation expenses in earlier discussions,[2] Grant explained in the July 26 e-mail, "I am not sure how much we can financially support your move to Virginia and I think that it would not be more than a flight to Virginia." (J.A. at 337-38.) The e-mail further stated that a contract would be ready for Ilozor to review in two or three weeks. On September 8, 2003, Ilozor signed a faculty contract for the 2003-2004 academic year that contained no provision for the payment of moving expenses.

Classes at Hampton's architecture school are often co-taught by a team of two professors, and Ilozor was assigned to co-teach a beginning architectural design studio with another faculty member, Professor Shannon Chance, during his first semester.[3] During that semester, Chance repeatedly complained to Grant that Ilozor did not respect her, undermined her, and gave conflicting directions in class. Ultimately, she told Grant that she would never teach with Ilozor again. According to Grant, students also complained that Ilozor "gave confusing directions in class." (J.A. at 225.)

Nevertheless, Grant gave Ilozor a favorable performance evaluation following the completion of the 2003 Fall semester.

---

[2] According to Ilozor, Grant told him that he would "bring [Ilozor] over" from Australia and that Hampton "look[s] after their people," (J.A. at 352, 727), during these earlier discussions.

[3] Design studios are courses in which architecture students receive a "hands on" opportunity to implement the principles that they have learned.

Specifically, Grant awarded Ilozor with a total numerical rating of 410, which fell into the category of "meets full standards."[4]   In addition, Ilozor received higher student evaluations than Chance on the class they co-taught together.

For the 2004 Spring semester, Grant assigned Ilozor to co-teach an intermediate design studio with another professor, David Peronnet, with whom Ilozor had developed a good relationship.   Shortly thereafter, Peronnet, too, began complaining to Grant about Ilozor.   Peronnet told Grant he could not teach with Ilozor and would never do so again. Students also complained to Grant that Ilozor was assigning too much material and failed to elaborate beyond the text in class.   The students further complained that they were receiving conflicting directions from the two co-teachers, which confused them.

Still, Grant recommended that Hampton retain Ilozor, and in keeping with that recommendation, Hampton renewed Ilozor's contract for the 2004-2005 academic year.

To Ilozor's chagrin, however, Grant did not offer him a tenure-track position.   Instead, when a PTT position became available, Grant recommended that Chance fill it, and, in May 2004, Chance, who had been a TA faculty member, signed a PTT

_____

[4] The evaluation had five categories: exceeds full standards, meets full standards, meets average standards, less than average standards, and less than minimum standards.

contract for the 2004-2005 academic year. Internal memoranda and e-mails confirm that Grant had sought to place Chance on the tenure-track before Ilozor came to Hampton. He first made this recommendation in a December 2002 memo, stating that Chance was "clearly one of the most effective new teachers in [the] Department" and praising, among other attributes, her "keen interest in the African built environment." (J.A. at 589.) Chance had not, however, completed a necessary three-year review at that time.

Ilozor was upset and believed he, not Chance, should have received the PTT contract. According to Ilozor, he confronted Grant about this on or about August 30, 2004; Grant responded by giving the following rationale for his decision: "[Chance] is a good American lady, she is younger than you are, she is free with no distraction from kids, and has a great potential to grow." (J.A. at 777.)[5]

Also in late August/early September, Grant made two remarks offensive to Ilozor. First, Grant told Ilozor that the design of Martin Luther King's Ebenezer Baptist Church "has been criticized and not accepted for imposing Africa on America, which is not desired. No American pretends to be an African. I have no connection with Africa. Any link that

---

[5] Grant denies making this remark, but, given the procedural posture of this case, we accept Ilozor's version of events as true.

exists has been cut indefinitely." (J.A. at 461.) Then, when Ilozor approached Grant about research related to African architectural taxonomy, Grant said, "That's African architectural culture," and "I am not an African. Go to an African." (J.A. at 462.) When Ilozor responded that he thought Grant was African-American given his complexion, Grant replied that his father was Native American.[6]

On August 10, 2004, Grant met with Ilozor and informed him that the upcoming year would be a critical one for his future at Hampton. Given the problems occurring during the courses Ilozor had co-taught the preceding year, Grant assigned Ilozor to teach a class by himself. The course was an advanced design studio in which students were to design a church. After Ilozor selected a large church as the subject of the course, Grant e-mailed him, telling him that "the scope and scale of the proposed new church may be too large" and recommending that Ilozor "try and scale back some parts of the project to better frame the setting for a comprehensive project." (J.A. at 599.) Ilozor responded that he did not consider the scale he had selected too large for a comprehensive design project. He then proceeded with his original syllabus.

---

[6] Again, Grant denies making these statements, but again, we accept Ilozor's testimony as accurate.

Ultimately, Grant considered Ilozor's class a failure. He claimed that students (and other faculty) complained to him that the project was too large. Also, students complained that Ilozor was inflexible, stifled creativity, and did not spend enough time critiquing their work. Moreover, Grant believed certain students did very poorly and should not pass the course; he told Ilozor of this belief, but Ilozor passed everyone anyway.

In addition, members of the Department's secretarial staff complained about Ilozor ordering them to do things in an inappropriate manner; faculty, too, complained that he had a condescending attitude.

On December 10, Grant informed Hampton's Provost, Dr. Haysbert, via e-mail that he was seriously considering not renewing Ilozor's contract and was consulting with Dr. Sheppard, the Dean of Hampton's School of Engineering & Technology, which includes the architecture department, before finalizing and formalizing the decision. Haysbert replied, advising that Grant submit Ilozor's name "in a memo with a brief rationale" and to inform Ilozor in a face-to-face meeting; she indicated that Grant did not need to give Ilozor a reason for not renewing his contract and advised that he not try to do so. (J.A. at 908.)

9

Accordingly, on January 4, 2005, Grant prepared a memo recommending non-renewal of Ilozor's contract. The memo stated that Ilozor's teaching method and general outlook did not fit well with the department, that Ilozor had not met the expectations Grant had for him given his credentials, and that Ilozor did not take suggestions well. The memo referenced Ilozor's credentials as "foreign based" and also indicated that, "[c]oming from Nigeria via Australia and arriving in the U.S. for the first time, Dr. Ilozor has had a very difficult time, understanding and contributing to our mission and direction." (J.A. at 46.) The memo concluded that Ilozor might to do well at another institution, but was not working out at Hampton, which "needed a full time senior faculty with different abilities and sensibilities than Dr. Ilozor offers at this time." (J.A. at 47.)

On the same day, Grant completed an evaluation for Ilozor for the Fall semester. He gave Ilozor a 350.5 numerical rating, the lowest score in the department but squarely within the "meets average standards" category. Grant attached to the evaluation supplemental comments, many of which involved the complaints and problems discussed in Grant's memorandum.

Sheppard concurred in Grant's recommendation, and, on January 7, 2005, Grant informed Ilozor his contract would not be renewed for the following year. According to Ilozor, Grant

10

told him that Ilozor had a communication problem and did not belong at Hampton and that Grant had "changed the direction of the department to which you may not fit," but that Ilozor would be a good fit for a research university. (J.A. at 456).

Thereafter, Hampton considered two candidates for Ilozor's position, Donald Armstrong, a then-53-year-old professor at Tuskegee University, and Daisy-O'lice Williams, who was twenty-four years old at the time and had just completed graduate school. Hampton selected Williams to replace Ilozor after Armstrong withdrew his name from consideration and Hampton's Assistant Provost for Academic Affairs deemed Williams an acceptable candidate in a memorandum noting that Williams had a "newly minted Master's degree" and would "be able to bring a fresh perspective to the department." (J.A. at 958.) The Assistant Provost did order that Williams be assigned a faculty mentor if hired, as she was "relatively young in her academic professional development."(J.A. at 58.)

Thereafter, Ilozor filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued him a right-to-sue letter, and Ilozor brought this action in the United States District Court for the Eastern District of Virginia on July 26, 2006. His amended complaint, filed on August 4, 2006, asserted eight claims against

11

Hampton, Grant, and Sheppard. Ultimately, however, Ilozor decided to pursue only his Title VII national-origin discrimination claim, his ADEA claim, and his breach-of-contract claim against Hampton. Accordingly, the parties filed a joint order of dismissal as to the other five claims, and the district court agreed to dismiss Counts II, IV, V, VI, and VII of Ilozor's complaint. The district court granted summary judgment in favor of Hampton on the remaining claims.

Ilozor timely appealed, and we have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

We review de novo the district court's grant of summary judgment to Hampton, applying the same standards that the district court was required to apply. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c) (West 1992)). As noted above, we construe the evidence in the light most favorable to Ilozor, the non-moving party, and draw all reasonable inferences in his favor. Id.

12

A.

Ilozor argues that Hampton violated both Title VII and the ADEA in declining to renew his teaching contract. Title VII makes it illegal to "discharge any individual . . . because of [his] . . . national origin," 42 U.S.C. § 2000e-2(a)(1), while the ADEA prohibits an employer from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C.A. § 623(a)(1). Although the protections of these statutes are available to aggrieved professors, "we review professorial employment decisions with great trepidation," remaining "cognizant of the fact that professorial appointments necessarily involve subjective and scholarly judgments, with which we have been reluctant to interfere." Jiminez v. Mary Washington College, 57 F.3d 369, 376 (4th Cir. 1995) (internal quotation marks omitted).

A plaintiff can establish a Title VII or ADEA claim through two alternative methods of proof: (1) a "pretext" framework that employs the burden-shifting analysis articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or (2) the "mixed-motive" framework established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).[7] Regardless of which method

_____

[7] We have not yet decided whether an ADEA plaintiff who lacks direct evidence of discrimination may proceed under the mixed
(continued...)

the plaintiff employs, "the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004) (en banc) (internal quotation marks omitted). "To demonstrate such an intent to discriminate, . . . an individual . . . must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision." Id. (internal quotation marks and alteration omitted). Thus, to prevail on his Title VII claim and/or ADEA claim, Ilozor must show that his contract was not renewed "because of a discriminatory reason." Jiminez, 57 F.3d at 377 (internal quotation marks omitted).

Ilozor argues that a reasonable jury could find that the non-renewal of his contract resulted from discrimination based on his Nigerian origin and/or his age because: (1) the

---

[7](...continued)
motive approach. See, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (reserving question). Two Circuits have split on the question. Compare Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004) (holding that ADEA plaintiff may present direct or circumstantial evidence of discrimination to warrant mixed-motive analysis) with Monaco v. American General Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004) (stating that ADEA plaintiff must present direct evidence of discrimination to warrant mixed-motive analysis). We need not resolve this issue today, as Ilozor could not benefit from a mixed-motive analysis in any event.

14

references to his background in Grant's January 4, 2005 memo constitute direct evidence of discrimination; and (2) Grant's comments in late August 2004 demonstrate a disdain for Africa and a preference for Americans. Ilozor thus contends that he has marshaled evidence sufficient to show (1) that Hampton's proffered reason for discharging him was a pretext for intentional discrimination, entitling him to prevail under the McDonnell Douglas framework, and (2) that his national origin was a motivating factor in the non-renewal decision, meaning he could also prevail under a mixed-motive framework.

The district court rejected both arguments. Having thoroughly reviewed the district court's opinion and the parties' briefs and submissions on appeal, and having heard oral argument in this case, we conclude that the district court did not err in granting summary judgment in favor of Hampton on Ilozor's employment discrimination claims, as Ilozor cannot benefit from either method of proof available to Title VII and ADEA plaintiffs.

In particular, we note that, as the district court explained, read in context, the January 4, 2004 memorandum's references to Ilozor's "[c]oming from Nigeria via Australia and arriving in the U.S. for the first time," (J.A. at 46), and to his credentials as "foreign-based," (J.A. at 46), do not render the memo a revelation of animosity toward or stereotyping of persons

15

with Ilozor's background.  The memo simply relates the problems with Ilozor's teaching and suggests that his unfamiliarity with American institutions such as Hampton might provide some explanation for his struggles.  Similarly, Ilozor has not provided a basis to support his speculation that Grant's statements that students complained that Ilozor "gave confusing directions in class," (J.A. at 225), and that although Ilozor might do well at a research university, he had a communication problem and did not belong at Hampton, represent veiled references to Ilozor's foreign accent.  He likewise has not indicated how Grant's comments that he did not personally consider himself an African and and that he believed no American should pretend to be African demonstrate a discriminatory animus towards people born in Africa.

Additionally, we, like the district court, note that the same person that hired Ilozor and decided to renew his contract for a second year (Grant) made the decision not to renew the contract for a third year. Compare Proud v. Stone, 945 F.2d 796, 797, 798 (4th Cir. 1991) (reasoning that "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job" and concluding that "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate

16

question' that discrimination did not motivate the employer" (internal quotation marks omitted)).

We also emphasize that Ilozor does not dispute that both professors who co-taught a course with him complained to Grant that they could not work with Ilozor and would not do so again; that in response, Grant assigned him to teach a course by himself; and that Grant ultimately considered that course a failure, in large part due to Ilozor's refusal to follow Grant's suggestions. Even viewing the evidence--in particular, Grant's remark that Chance received a PTT position because she was a "good American lady," (J.A. at 415), who was younger than Ilozor--in the light most favorable to Ilozor, a reasonable jury simply could not conclude that Hampton's decision not to renew Ilozor's contract was based on his national origin and/or age, rather than the problems with his performance and his difficulty working in Hampton's collaborative environment. See EEOC v. Clay Printing Co., 955 F.2d 936, 943 (4th Cir. 1992) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [for the plaintiff to prevail]; there must be evidence upon which the jury could reasonably find for the plaintiff." (internal quotation marks omitted)).

B.

Ilozor also brought a breach of contract claim, which the parties agree is governed by Virginia law, against Hampton. He

argues that Hampton, through Grant, promised to reimburse Ilozor for the expenses he incurred in moving to Virginia, but failed to honor that agreement.  We agree with the district court that Grant, by indicating that Hampton took care of its employees and stating in the July 26, 2003 e-mail, "I am not sure how much we can financially support your move to Virginia and I think that it would not be more than a flight to Virginia," (J.A. at 337-38), plainly did not create an enforceable contract for the payment of all costs associated with moving Ilozor and his family from Australia to Virginia.  We therefore affirm summary judgment on this claim for the reasons stated by the district court.  See generally Ilozor v. Hampton University, 4:06cv90 (E.D. Va. 2007).

                                III.

    For the foregoing reasons, the judgment of the district court is . . .

                                                    AFFIRMED.

18